**PENNSYLVANIA GAS AND WATER COMPANY, Petitioner,**

v.

**FEDERAL POWER COMMISSION, Respondent,**

**Manufacturers Light and Heat Company and Home Gas Company, Intervenors.**

No. 23051.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 9, 1970.

Decided March 19, 1970.

Petition for Rehearing Denied May 25, 1970.

Mr. Reuben Goldberg, Washington, D. C., with whom Mr. Allan Freidson, Washington, D. C., was on the brief, for petitioner.

Mr. David F. Stover, Atty., Federal Power Commission, with whom Messrs. Richard A. Solomon, Gen. Counsel at the time the brief was filed, Peter H. Schiff, Solicitor, and Robert L. Russell, Asst. Gen. Counsel, Federal Power Commission, were on the brief, for respondent.

Mr. Giles D. H. Snyder, Columbus, Ohio, with whom Mr. William C. Hart, Washington, D. C., was on the brief, for intervenors.

Before BAZELON, Chief Judge, and WRIGHT and LEVENTHAL, Circuit Judges.

LEVENTHAL, Circuit Judge:

This case presents questions relating to the justification required for issuance of temporary certificates, without a hearing, under § 7(c) of the Natural Gas Act. Petitioner, Pennsylvania Gas and Water Company (Penn Gas), seeks review of the Federal Power Commission's letter order issued March 17, 1969 granting a temporary certificate to The Manufacturers Light and Heat Company (Manufacturers) and Home Gas Company (Home) to coordinate their operations pending hearing and decision on their joint application filed June 20, 1968, for a permanent certificate, authorizing coordinated operations.

Manufacturers and Home are wholly owned subsidiaries of the Columbia Gas System. Manufacturers sells gas at wholesale to a number of distribution companies in Pennsylvania, Ohio, and West Virginia, including petitioner, Penn Gas, which sells natural gas at retail in certain areas of Pennsylvania. Manufacturers also sells to its affiliate Home, which operates a pipeline and storage facilities in New York. Petitioner was permitted to intervene in opposition to their application for a permanent certificate, and under the Natural Gas Act a hearing is required.

The temporary certificate granted without a hearing presents the issue whether the applicants presented a situation appropriate for Commission exercise of the unusual authority conferred by section 7(c) of the Natural Gas Act, 15 U.S.C. § 717f(c), to "issue a temporary certificate in cases of emergency, to assure maintenance of adequate service or to serve particular customers, without notice or hearing, pending the determination of an application for a certificate * * *." We conclude that the Commission exceeded its authority under section 7(c), and vacate the order granting the temporary certificate.

I

The background of the case includes, notably, a proposed rate settlement that Home filed on July 4, 1968, with the Commission, which significantly altered its natural gas rate structure. The settlement was approved in Home Gas Co.,

40 FPC 1008 (1968). Home's settlement altered its two-part tariff so as to increase the demand charge, paid for the entitlement to receive every day a certain quantity of gas (the contract demand), and to decrease the commodity charge, which the buyer must pay, in addition to the demand charge, for the gas actually delivered.

The contract demand is the volume which the seller is contractually obliged to deliver, each and every day of the year, and which the buyer is contractually obligated to take—in the sense that it is paid whether he takes the gas or not. The buyer sets contract demand in light of his peak needs, and for that security pays the demand charge for the entitlement to receive the gas whether or not it is in fact used.

The buyer who buys his full demand entitlement every day operates at 100% load factor and receives the most gas for the money. The higher the demand charge is in relation to the commodity charge, the steeper is the penalty to the buyer who pays a demand charge for gas not used.

Thus one effect of Home's new rate structure was to increase the incentive for Home's customers to purchase more of the gas to which they were entitled by virtue of the contract demand specified. Two of Home's customers, Orange and Rockland Utilities, Inc. (Rockland) and Central Hudson Gas and Electric (Central Hudson) had been purchasing at a load factor of about 40%, i. e., average daily volumes were about 40% of contract demand. The new Home rate made it desirable for them to purchase natural gas not only for space heating—the demand for which is greatest in the winter—but also for the generating of electricity, a type of demand that is strong, under modern conditions of usage (air conditioning), in the "valley" summer months that are generally low in gas demand. These customers had advised Home in 1968, prior to Home's filing of its tariff change, that if Home dropped its commodity charge

from 34.5¢ per Mcf to 31¢ or less they would increase substantially their off-peak summer purchases so as to bring their future purchases from Home close to a 100% load factor. And in accordance with this advance indication they determined, when Home changed its rate structure, to purchase each day nearly 100% of the gas to which they were entitled.

To supply this additional gas Home had to increase its purchases from Manufacturers. Home, however, was already in a position where it bought from Manufacturers nearly 100% of its contract demand each day. Home could do this because it could place the large quantities of "valley" gas bought in the off-peak summer season into its storage fields, and could draw on this gas in storage to make delivery during the winter. If as a result of increased summer demands from Rockland and Central Hudson, Home were to purchase additional gas from Manufacturers, Manufacturers' applicable rate schedule would have required Home to pay both a commodity charge and a demand charge for the additional gas purchased. To Home, however, whose customers had already paid the demand charge, the additional gas now being taken would result in the additional payment of only the commodity charge. Thus Home faced incurring a new demand charge cost for which there would be no offsetting increase in demand charge revenue. Home was confronted with the prospect of paying Manufacturers 39.86¢ per Mcf (the sum of the commodity and demand charges) for gas for which it would receive additional revenues of only 30.98¢ (commodity charge).

The joint application for a permanent certificate for coordinated operation presented the claim that if Home and Manufacturers continued as separate entities, Home's need for the additional volume (6.6 million Mcf per year) projected upon approval of the rate settlement meant that Home would have to increase its contract demand with Manu-

facturers by 20,500 Mcf per day.[1] It was asserted that Manufacturers in turn would have to increase its contract demand with its affiliated supplier, United Fuel Gas Company, by 11,000 Mcf per day, and to construct 10.1 miles of 20-inch loop pipeline in order to handle the increase in peak day deliveries from United Fuel.

The application asserted that the comparative economics would be benefited if Home and Manufacturers functioned as a single unit for Manufacturers had a "valley" in its summertime purchases from United Fuel that was sufficient to accommodate the amount of increased summer volumes projected for Rockland and Central Hudson. Under coordinated operations, it was asserted, Manufacturers would have available to it the storage capacity on the Home system, which would be "idled" if the summer purchases which Home previously transported to storage fields were instead transmitted to Rockland and Central Hudson.

When Manufacturers and Home filed on June 30, 1968, their joint application for a permanent certificate authorizing coordination of operations, they were on notice that this would be opposed by petitioner Penn Gas on the ground of adverse cost consequences to the customers of Manufacturers. Indeed the record indicates that when Manufacturers conducted its March and April 1968 rate settlement conferences, paralleling the Home settlement, it undertook to secure the agreement of its customers to coordinated operations, and when this was not forthcoming the coordinated operations feature of the program was withdrawn from the rate settlements with advice to the conferees that a certificate application would be filed at a later date.[2]

On July 26, Penn Gas filed its application to intervene. It objected to the cancelation of the separate tariffs of Manufacturers and Home and their replacement by a joint tariff, asserting that the proposals raised complex and important issues requiring full exploration in a hearing, and alleging that the application as filed would substantially increase the cost of gas purchased by Penn Gas from Manufacturers. The intervention petition specifically noted that one of the proposals in the application would impose on Manufacturers' customers a new minimum commodity obligation requiring them to purchase gas at a load factor first of 60% (beginning in 1968), then 62½% (1969), and then 65% (1970 and thereafter).

On October 10, two days after Commission approval of the new settlement structures filed by Home and Manufacturers these companies filed their joint application for a temporary certificate authorizing coordinated operations.[3] The following points were made in support of the applications: 1) the construction of new facilities was not involved; 2) under non-coordinated operations Home would receive only 30.98¢ per Mcf for gas which would cost 39.86¢

---

1. This assumed that Home would continue to make purchases at 100% load factor.

2. This appears from the answer of Penn Gas, docketed October 22, 1968, in opposition to the application for temporary certificate (JA 49–50). It is not contradicted in the answer thereto filed by applicants, although they put it (JA 67–68) that it was agreed that a certificate application would be a better vehicle than the rate settlement to effectuate coordination of operations.

3. The application proposed that under coordinated operations, the present service agreement between Manufacturers and Home would be cancelled, Manufacturers would discontinue the separate billing of interstate gas to Home and the market requirements of the customers of Manufacturers and Home would be furnished in a manner which would utilize most effectively the interstate pipeline and storage facilities of Manufacturers and Home to the maximum advantage of both companies. Jurisdictional sales hereafter by Manufacturers and Home would be made under a joint FPC gas tariff containing the provisions set forth in Exhibit P. The joint tariff would supersede and cancel the FPC gas tariff of Manufacturers and Home currently in effect.

per Mcf if purchased at 100% load factor; 3) under non-coordinated operations Home's additional demand could not be supplied by Manufacturers without the construction of additional facilities while under coordinated operations Manufacturers could make available additional gas to meet Home's demand; 4) that there was no viable alternative to coordinated operation; and 5) coordinated operation would not operate to the disadvantage of any party. As to the minimum load factor of 60–65%, the applicants, taking note of objections leveled against this proposal, agreed to suspend this feature of their plan pending ruling on the application for a permanent certificate.

On October 22, Penn Gas filed a memorandum in opposition to the application for a temporary certificate. It argued that there was no emergency within the meaning of section 7(c) of the Natural Gas Act which gave the Commission authority to issue the temporary certificate. It pointed out that Home had chosen to proceed with the settlement of its new rate despite the fact that Home knew as long ago as February 1968 that its customers would increase their take substantially if Home's proposal for rate structure changes became effective.

Penn Gas stressed that no changes of any kind were needed for the winter of 1968, since the increased volumes would be sought only in the summer of 1969. It argued that if an additional 10 miles of loop were necessary there was plenty of time to certificate this by the summer of 1969. But it pointed out that in view of Manufacturers' admitted "ample valley" in its summer purchases from United Fuel, additional gas could be provided very simply through "establishment of a rate schedule providing for off-peak annual volumes at a price less than the average 100% load factor price for Contract Demand gas" (in the same way as is provided in the ACQ schedules

of Transco and Texas Eastern and the SO schedule of Tennessee Gas).[4] It further set forth that Manufacturers also had other volumes available from Transco and Tennessee.

Meriting quotation, we think, is this paragraph from the opposition of Penn Gas:

But applicants do not want such solutions. They want to force "coordinated operations" and to begin them under a temporary certificate in an effort to prejudice the final decision in their favor. So they assert, erroneously, that there is no solution other than the purchase of additional Contract Demand and the construction of facilities, asserting also that Home would be selling gas at a loss if it were required to purchase Contract Demand and sell that gas only at its commodity rate. An emergency within the meaning of the proviso of Section 7(c) does not exist merely because the economics of a sale may be unsatisfactory or the parties prefer other arrangements, particularly when the economics are of Applicants' own making.

The responses filed by Home's customers put it that Penn Gas, which had previously sought virtual abandonment of the Manufacturers' system as a supplier, did not represent the best interests of Manufacturers' customers, and that the common objection to temporary certificates, that the temporary order may make the matter a *fait accompli* on consideration of the permanent certificate, is inapplicable since there was no request for construction of facilities, and the companies are willing to keep separate records and return to their uncoordinated status, if so ordered.

The applicants' answer to Penn Gas took note of its argument of alternative methods of meeting Home's requirements pending final determination, and

4. The establishment of this off-peak service would have required Commission approval in view of the volumetric limitations in Manufacturers' outstanding certificate, but the application under § 7(a) could have been limited to an increase in volume for off-peak delivery rates.

responded that these "would also require Commission authorization," "could very well involve less efficient arrangements for gas supply with irreversible implications" and "could very well involve substantial opposition by Penn Gas, as well as other customers."

On March 17, 1969, the Commission issued its letter order stating: "Based on the allegations presented in the request for a temporary certificate the Commission finds that an emergency exists within the meaning of section 7 of the Natural Gas Act." It granted the temporary certificate requested subject to the conditions that (1) the companies maintain their books and records in a way which would permit them to "resume individual operations" in the event the Commission should deny the permanent certificate, and (2) the companies bill their respective customers at each company's filed rates, including their recently filed increases when and if effective.[5]

On April 16, Penn Gas filed a timely application for rehearing and stay of this letter order. It substantially reiterated its earlier points, adding the contentions that the non-existence of the "emergency" required by law was if anything confirmed by the delay on the Commission's part of 4½ months after November 1, 1968, that the order was devoid of any findings showing the reasoning or path by which it found an emergency, and that the lack of authority for the letter-order was not overcome by the attachment of the bookkeeping and billing conditions.

The Commission's order of May 16, 1969, denied rehearing and stay. It stated that the Penn Gas objection based on the failure to provide protection for Manufacturers' customers against adverse impact of the temporary authorization in the event a permanent certificate is denied—was negated by the conditions imposed in the temporary certificate, and that all the information necessary to regulate the companies on an individual basis would be preserved in or could be derived or "imputed" from the records they were required to keep, and hence the temporary certificate would not be "detrimental to the rights of the parties to the permanent certificate proceeding or any rate case involving Manufacturers and Home." The Commission further stated that the emergency responded to was an evident one in view of Home's obligation to deliver the additional volumes to its two principal customers and the fact that the cost to Home for these sales would be 39.86¢ per Mcf while revenue would only be 30.98¢ per Mcf.

II

Section 7(c) of the Natural Gas Act provides that no natural gas company—

shall engage in the transportation or sale of natural gas, subject to the jurisdiction of the Commission, or undertake the construction or extension of any facilities therefor, or acquire or operate any such facilities or extensions thereof, unless there is in force with respect to such natural-gas company a certificate of public convenience and necessity issued by the Commission authorizing such acts or operations * * *. [T]he Commission shall set the matter for hearing and shall give * * * reasonable notice of the hearing thereon * * *: *Provided, however,* That the Commission may issue a temporary certificate in cases of emergency, to assure maintenance of adequate service or to serve particular customers, without notice or hearing, pending the deter-

5. The Commission's order of February 4, had suspended applicants' recent rate increases, pending investigation, until July 10, 1969. The Commission's order also provided that the granting of the temporary certificate would have no effect on the jurisdiction of the Securities and Exchange Commission to consider the issue of the retainability of Home Gas Company as part of the integrated natural gas system of The Columbia Gas System, Inc., which issue was reserved for future consideration and determination by an SEC Order of November 30, 1944.

574

mination of an application for a certificate * * *. ·

The question before us is whether the joint application of Home and Manufacturers presented the conditions of emergency justifying the Commission's exercise of its temporary certificate authority.

Section 7, the certificate section, differs from section 4, which is applicable to rates. Section 4 allows a new rate to be put into effect without Commission approval subject to the possibility of a 5-month suspension by the Commission and of ultimate rejection of the filed rates as unreasonable, discriminatory, etc. Section 7(c) requires the Commission to provide opportunity for hearing before deciding whether new operations proposed should be certified as serving the public convenience. Congress recognized, however, that the delay inherent in hearing procedures could prevent effective response in cases of emergency need. Accordingly in 1941 Congress amended § 7(c) so as to give the Commission authority to meet certain necessities of this sort by way of temporary certificates.

The provision as originally proposed would have given broad authority to issue temporary certificates in case of emergency. H.R. 5249, 77th Cong., 1st Sess., July 7, 1941. Upon objection that this grant was too broad, it was narrowed to read: "issue a temporary certificate in cases of emergency, to assure maintenance of adequate service or to serve particular customers." The Commission, invited to give comments, reported to the House:

> The [original] language in subsection (c) [relating to the grant of temporary certificates] was put in the bill primarily to provide for emergency interconnections of pipe lines, which are sometimes necessary to make it possible to maintain adequate service in cases of extraordinary peak demands, breakdowns, and so forth.

* * * * * *

"The chief purpose of change (1) was to avoid grant of a temporary certificate for a complete new pipeline system and to limit the authority for granting a temporary certificate to emergency situations involving only a comparatively minor extension or enlargement of the facilities of an existing system." [6]

The House Committee adopted the proposed qualification, and in its report, accompanying the final version of the bill, stated:

> "The committee amendment [inserting the words 'to assure maintenance of adequate service or to serve particular customers'] was made to limit the authority for granting a temporary certificate to emergency situations involving only a comparatively minor extension of the facilities of an existing system." H.R.Rep. No. 1290, 77th Cong., 1st Sess. 5 (1941).

■ It appears that the provision of § 7(c) for temporary certificates was meant to cover a narrow class of situations, to permit temporary and limited interconnection, or expansion of existing facilities in order to meet such emergencies as breakdowns in the service of operating natural gas companies, or sudden unanticipated demands. Algonquin Gas Transmission Co. v. FPC, 201 F.2d 334 (1st Cir.1953).

■ Restraint is required against the temptation to take action on the ground that there is an emergency when what is more significantly operative is the conviction that the action seems eminently reasonable on inspection of the file. There is momentum which tends to perpetuate the temporary into the enduring. The probability that an agency may pull itself up by its bootstraps cannot inhibit the temporary power when a true emergency exists. Algonquin Gas Transmission Co. v. FPC, *supra*. But the problem bids the agency use caution before it determines that what is presented

---

6. Hearings before Committee on Interstate and Foreign Commerce on H.R.

5249, 77th Cong., 1st Sess. 82, 83–84 (1941).

is the kind of emergency contemplated by Congress. Nor may an agency take precipitate action without a hearing on the ground that it can always cancel out and reconstruct if so advised after hearing. To act in haste, repent at leisure, is not a sound motto for an administrative agency.

■ In our view the joint application of Home and Manufacturers does not establish the kind of "emergency" needed to justify the issuance of the temporary certificate requested without a hearing, under the 7(c) exception to the general section 7 hearing requirement. It is alleged that an emergency was created by the increase in demand from Rockland and Central Hudson due to Home's new rate structure. But this was not an unanticipated demand that came on Home unawares. It was a foreseeable condition, and Home had been put on notice beforehand that there was at least a question as to effect on Manufacturers' existing customers, and that Penn Gas, at least would protest and demand its statutory opportunity for hearing. It may very well be that Manufacturers and Home stand on very sound ground. But that is something to be decided by the Commission after hearing. And one can sympathize with the objectives of the Columbia Gas companies without concluding that they are free to invoke temporary powers by precipitating an "emergency."

■ The bookkeeping and billing conditions inserted in the temporary certificate are not the complete answer the Commission supposes. Even assuming that the data would permit the Commission to reconstruct the ingredients of individual regulatory controls, as of rates, this would present not inconsiderable difficulty. The Commission's opinion on rehearing states that if requisite in a rate case it could e. g. "impute" a contract demand volume for Home based on actual deliveries between Manufacturers and Home. But unless the joint application consisted merely of empty and illusory phrases, their presentation that coordinated operations would permit greater efficiency in operation must have presupposed that they could and would operate in a different way in terms of physical movements if allowed to proceed on a coordinated rather than an uncoordinated basis. Even assuming it may be possible to disregard or undo the temporary operation the regulatory difficulties involved in any unscrambling may be sufficient to give the temporary certificate a momentum that is as meaningful in fact as it is unwarranted in law.

The problem is underscored if note is taken of the circumstance that nullification of the temporary certificate may require Manufacturers to bill Home for gas delivered under the temporary at the 39¢ Mcf rate. The result of this would be to impose on Home the very liability which had been described as an "emergency" whose avoidance was so imperative as to constitute a justification for issuing the temporary certificate without a hearing. It thus may well come about that the Commission may be led to grant the coordinated operation on a permanent certificate, in order to avoid this "harsh" result, though untrammeled it might have reached a different view on the extent or manner of coordination —especially in view of the possibility raised in the pleadings of Penn Gas of a softer alternative that would not constitute as much of a commitment toward the solution sought by the applicants.

■ What the Commission has done is to characterize as an "emergency" within the meaning of section 7 an economic predicament which it is not free to determine is contrary to the public interest except after opportunity for Penn Gas to present evidence and alternatives. The customers of Manufacturers have the right under the Act to ask the Commission to consider, after a hearing, whether the coordinated operation requested by applicants is contrary to the public interest because of its tendency to lead to a lumping together of all the customers of both companies; because e. g.

the high minimum load factor reasonable for Home's customers should not be infused into Manufacturers' operation; or because the savings which accrue through the purchase of "valley" gas by Manufacturers should be earmarked for Manufacturers' customers, wholly or in part, rather than be diluted through coordinated operations. Manufacturers' customers are entitled to an untrammeled determination of the propriety of coordinated operations which disadvantage customers of Manufacturers in order to provide better (or "more competitive") rates to Home's customers.

 There is latitude for agencies to expedite hearings in the public interest. Marine Space Enclosures, Inc. v. FMC, 137 U.S.App. 577, 420 F.2d 577 (July 31, 1969). But only a narrow class of real "emergency" cases justifies the taking of action such as temporary certificates on an informal examination of the file without opportunity for hearing.

To avoid misunderstanding we interject that the case before us is to be distinguished from a class of cases where there is notice and opportunity for hearing, but the presentations and contentions of the parties can be fully and fairly considered by a procedure other than an evidentiary hearing—most clearly, e. g., where only a question of law is involved. *Cf.* Citizens for Allegan County, Inc. v. FPC, 134 U.S.App. D.C. 229, 414 F.2d 1125 (April 29, 1969), and cases there cited notes 5–8. In such a case there is first, notice, and second, opportunity to set forth and develop the issues that are contended to necessitate or at least warrant an evidentiary hearing, and these may be issues of judgment as well as issues of evidentiary fact. The question before us, in contrast, is whether there exists an emergency of the character contemplated by § 7(c), so that the agency has au-

thority to enter its order without even giving notice.

The "emergency" presented by the applicants and adopted by the Commission was a condition resulting from their own action in proposing and approving the rate settlement, without coordinating (and if necessary deferring) that rate development until the approval, after hearing, of the certificates necessary for the increased volumes all knew to be in prospect.

We do not think this is the kind of emergency—the kind of "extraordinary peak demand" or "breakdown"—which was contemplated by Congress as the occasion for the extraordinary power provided by § 7(c).

We are not blind to the possibility, glimpsed from a memorandum filed with the Commission by Home's customers, and brought to the court's notice through the not untypical technique of a footnote reference in the Government's brief, that the hearing being sought is a ploy by Penn Gas, not so much a means of vindicating the interests of Manufacturers' customers as a technique to ease its release to a newer and more attractive supplier. This court cannot refrain from adhering to the scripture of fair hearing because of the hint of diabolic purpose of the litigant. We need not consider what bearing this consideration might have had if developed as to the facts and invoked by the Commission.

Much that is sound and prophylactic in corporate law was developed in so-called strike suits of derivative actions. Advances in the domain of criminal procedure have been gained at the behest of unattractive defendants. And in the field of administrative law, courts have long been aware that it is only by according "private attorney general" standing to those with a private interest that important considerations of public interest may be ventilated.[7]

7. FCC v. Sanders Bros. Radio Station, 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869 (1940); Associated Industries of New York State, Inc. v. Ickes, 134 F.2d 694, 704 (2d Cir.), vacated as moot, 320 U.S. 707, 64 S.Ct. 74, 88 L.Ed. 414, (1943); National Coal Assn. v. FPC, 89 U.S.App. D.C. 135, 191 F.2d 462 (1951); City of Pittsburgh v. FPC, 99 U.S.App.D.C. 113, 237 F.2d 741 (1956).

But if we are concerned by taint of the administrative process, we cannot deny an uneasiness on reading with even a minimum of diligence the presentation reiterated by the Commission even though the intervening months provided time for realistic analysis. Thus there is an element of simplistic distortion in ascribing an emergency to the "loss" faced by Home without any offset for the "gain" that would be realized by its affiliate.

Moreover, there is uneasiness over the insistence that the emergency was such that the relief sought was the only available solution. An attentive analysis of the emergency involved is essential to the sound exercise of emergency powers.

There is a relation between the kind of emergency and nature of the solution. Thus it is not an adequate justification for the Commission's action here merely to state that other possible solutions to the alleged emergency would have required Commission approval without adverting to whether these alternatives offered a more confined solution to the real emergency. It can hardly be thought that an emergency permits temporary authorization for broad changes in operation which go far beyond the exigencies of urgent need.

These reflections are induced by the consideration that if the demands of Home's customers presented an emergency, it was of a more limited nature, describing only the need for a temporary expansion of Manufacturers' certificates insofar as it limited the volumes deliverable to Home. This is the kind of agency action, approval of increased volume, that would have been related to the kind of emergency, the "emergency interconnection" or "minor extension or enlargement," contemplated in the legislative history of § 7(c).

Looking at the case in the context of this limited need, however, we discern no answer in the record to the Penn Gas contention that this limited need could have been taken care of by a lesser certificate, one merely authorizing increased volumes from Manufacturers to Home. This increased volume could have been provided without any approval of a coordinated operation that would factually have presaged approval of the permanent certificate sought by applicants. Manufacturers could have established a temporary rate for this off-peak gas, and for this no separate Commission approval was required. This would not have affected the status quo of the present tariffs payable by the customers of either Home or Manufacturers during the temporary period.

When all is said the Commission has granted temporary authority for a merger, with momentum to a permanent merger that may have practical consequences to the customers of one of the merged companies, when the only showing for proceeding without a hearing is that the action would permit one company to move increased volumes to another, an action to meet a demand that was foreseeable and stimulated by a company rate adjustment and that could have been provided by a lesser order. There may be economic support for a further action, of coordination that would permit operational readjustment resulting in a decrease in overall costs. This may well be in the public interest, but the decision should have been made in the context of a hearing, expedited, yes, but not bypassed.

The order granting the temporary certificate is vacated. The case is remanded for further consideration by the Commission as may be appropriate, including such consideration as may be pertinent in the context of its determination of the application for permanent certificate.

So ordered.