**CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., Petitioner,**

v.

**FEDERAL POWER COMMISSION, Respondent,**

Brick Institute of America, Intervenors.

**STATE OF NORTH CAROLINA and North Carolina Utilities Commission, Petitioners,**

v.

**FEDERAL POWER COMMISSION, Respondent,**

Piedmont Natural Gas Co., Inc., et al., Intervenors.

**ALABAMA GAS CORPORATION, Petitioner,**

v.

**FEDERAL POWER COMMISSION, Respondent,**

Southeast Alabama Gas District et al., Intervenors.

**ATLANTA GAS LIGHT COMPANY, Petitioner,**

v.

**FEDERAL POWER COMMISSION, Respondent,**

South Carolina Electric & Gas Company et al., Intervenors.

**BATTLE CREEK GAS COMPANY et al., Petitioners,**

v.

**FEDERAL POWER COMMISSION, Respondent,**

National Distillers and Chemical Corp. et al., Intervenors.

**MICHIGAN CONSOLIDATED GAS COMPANY, Petitioner,**

v.

**FEDERAL POWER COMMISSION, Respondent,**

Michigan Gas Storage Company et al., Intervenors.

Nos. 73–1999, 73–2017, 74–1150, 74–1200, 74–1184 and 74–1231.

United States Court of Appeals, District of Columbia Circuit.

Nov. 26, 1974.

William I. Harkaway, Washington, D. C., with whom Charles J. McCarthy, Washington, D. C., and Robert A. Froehlich, New York City, were on the brief for petitioner in No. 73–1999.

Morton L. Simons, Washington, D. C., for petitioners in No. 73–2017.

Harold L. Talisman, Washington, D. C., with whom Melvin Richter, Washington, D. C., and A. S. Lacy, Birmingham, Ala., were on the brief for petitioner in No. 74–1150.

John E. Holtzinger, Jr., Washington, D. C., with whom Paul H. Keck, Washington, D. C., was on the brief for petitioner in No. 74–1150.

J. Richard Tiano, Washington, D. C., with whom Richard M. Merriman, and Richard T. Witt, Washington, D. C., and Raymond P. Buschmann, Chicago, Ill., were on the brief for petitioners in No. 74–1184.

John E. Haley, Washington, D. C., with whom Richard J. Flynn, Washington, D. C., Frederick G. Berner, Jr., and Gary L. Cowan, Washington, D. C., were on the brief for petitioners in No. 74–1231.

George W. McHenry, Jr., Sol., Federal Power Commission, with whom Leo E. Forquer, Gen. Counsel, William J. Grealis, Thomas M. Walsh and John R. Staffier, Attorneys, F. P. C., Washington, D. C., were on the brief for respondent.

Richard A. Solomon, Washington, D. C., for intervenor National Distillers and Chemical Corp.

Raymond N. Shibley, Washington, D. C., with whom James J. Flood, Jr., Washington, D. C., was on the brief for intervenor Panhandle Eastern Pipe Line Co.

James J. Flood, Jr., Washington, D. C., with whom William A. Major, Jr., Birmingham, Ala., was on the brief for intervenor Southern Natural Gas Co.

Joseph T. Stevens, for intervenor Brooklyn Union Gas Co. No brief was filed by intervenor Brooklyn Union Gas Co. Barbara M. Gunther, Brooklyn, N. Y., entered an appearance for intervenor Brooklyn Union Gas Co.

John T. Ketcham, and Robert J. Haggerty, Washington, D. C., were on the brief for petitioner Anchor Hocking Corp. in No. 74–1184.

Edward J. Grenier, Jr., Richard P. Noland, Richard J. Pierce, Jr., and David C. Evans, Washington, D. C., were on the brief for intervenors Brick Institute of America and Brick Ass'n of North Carolina.

Dale A. Wright and Melvin Richter, Washington, D. C., were on the brief for intervenor Piedmont Natural Gas Co., Inc.

John T. Miller, Jr., Washington, D. C., was on the brief for intervenor Elizabethtown Gas Co. and for intervenors A. P. Green Refractories, Co., and others.

Frederick Moring, Washington, D. C., was on the brief for intervenor South Jersey Gas Co. Paul H. Keck, Washington, D. C., entered an appearance for intervenor South Jersey Gas Co.

Peter H. Schiff, Albany, N. Y., and Richard A. Solomon, Washington, D. C., were on the brief for intervenor Public Service Commission of the State of New York.

Daniel L. Bell, Jr., and Giles H. Snyder, Charleston, W. Va., were on the brief for intervenor Columbia Gas Transmission Corp.

George A. Avery, Toni K. Golden and James K. White, Washington, D. C., were on the brief for intervenor Michigan Gas Storage Co.

Henry F. Krautwurst, Monte R. Richards and Susan A. Low, Washington, D. C., were on the brief for intervenor Washington Gas Light Co.

Edward S. Kirby, Newark, N. J., was on the brief for intervenor Public Service Electric and Gas Co. in support of petitioners' motion for stay to maintain the status quo etc. James R. Lacey, Newark, N. J., entered an appearance for intervenor Public Service Electric and Gas Co.

Thomas F. Ryan, Jr., Washington, D. C., entered an appearance for intervenor Transcontinental Gas Pipe Line Corp.

Donald W. McCoy and Alfred E. Cleveland, Fayetteville, N. C., entered appearances for intervenor North Carolina Natural Gas Co.

Jack M. Irion, Shelbyville, Tenn., entered an appearance for intervenor Union Cities Gas Co.

Joseph W. Ferraro, Jr., Newark, N. J., entered an appearance for intervenor The New Jersey Board of Public Utility Commission.

F. Kent Burns, Raleigh, N. C., entered an appearance for intervenor Public Service Co. of North Carolina, Inc.

William W. Ross, Washington, D. C., entered an appearance for intervenors Pomona Corp.

Edward J. Grenier, Jr., Richard P. Noland and Richard J. Pierce, Jr., Washington, D. C., entered appearances for intervenors General Motors Corp. and Georgia Industrial Group.

David C. Murchison and Richard S. Harrell, Washington, D. C., entered appearances for intervenor Caterpillar Tractor Co.

John W. Glendening Jr., and John S. Schmid, Washington, D. C., entered appearances for intervenor Mueller Brass Co.

Harold L. Talisman, Washington, D. C., entered an appearance for intervenor Corning Glass Works.

Michael J. Manning, Washington, D. C., entered an appearance for intervenor Anderson Clayton Foods.

Raymond D. Hurley, Washington, D. C., entered an appearance for intervenor Owens-Corning Fiberglas Corp.

James R. McClarnon, Indianapolis, Ind., entered an appearance for intervenor City of Indianapolis, etc.

George Mabry entered an appearance for intervenor Johns-Manville Fiber Glass, Inc.

Ronald D. Eastman, Washington, D. C., entered an appearance for intervenor The American Textile Manufacturers Institute, Inc.

Ronald L. Winkler, Washington, D. C., entered an appearance for North Carolina Congressional Delegation to the Congress of the United States as amicus curiae and also for intervenor Brick Institute of America.

Peyton G. Bowman, III, Washington, D. C., entered an appearance for intervenor South Carolina Electric and Gas Co.

Carl L. Evans, Montgomery, Ala., entered an appearance for intervenor Alabama Public Service Commission.

William T. Miller, Washington, D. C., entered an appearance for intervenor Southeast Alabama Gas District.

M. John Bowen, Jr., Columbia, S. C., entered appearances for intervenors South Carolina Public Service Commission and South Carolina Energy Management Office.

Jerome Ackerman, Washington, D. C., entered an appearance for intervenor Staffer Chemical Co.

Edward W. Stern, Philadelphia, Pa., entered an appearance for intervenor Philadelphia Gas Works.

Before BAZELON, Chief Judge, LEVENTHAL, Circuit Judge and AUBREY E. ROBINSON, Jr.,** United States District Judge for the District Court of the District of Columbia.

PER CURIAM:

Oral argument in these three groups of consolidated appeals was heard on November 21, 1974. In addition to the issues presented on the merits of petition-

** Sitting by designation pursuant to 28 U.S.C. § 292(a).

ers' claims, we asked counsel in Consolidated Edison v. FPC to address themselves to a number of motions recently filed by petitioners, intervenors and the FPC, as respondent, in that case. We deal presently only with the problems raised in these motions, to which a speedy response is sought by all parties and required by the onslaught of winter and a deepening shortage of natural gas. A full understanding of our response requires a brief review of the background litigation.

Petitioners in all three cases are customers of natural gas pipeline companies—Transcontinental Gas Pipe Line Corporation (Transco); Southern Natural Gas Company (Southern); Panhandle Eastern Pipe Line Company (Panhandle). They contest the legality of service curtailment plants filed by the pipelines reflecting the priorities outlined in FPC Order No. 467,[1] as modified by Order No. 467–B.[2] In each case, prior to the issuance of Order No. 467 on January 8, 1973, the pipeline had filed an interim curtailment plan negotiated among its own customers under FPC Order No 431. And in each case, after attempts to extend the interim plan, or to file revised plans not in accord with Order No. 467,[3] the pipeline submitted a plan more or less consistent with the requirements of the order.

Appeals were filed from FPC orders effectuating the 467-type plans, and petitioners in each case moved for a stay *pendente lite*. In two cases, those involving Transco and Southern, the stays were granted.[4] In terms of the need for any immediate order of the court, it was accepted by Commission counsel, and was the prevailing consensus at oral argument, that the present situation—with a stay in effect in the Southern case, and the stay denied in Panhandle—was likely to be as protective of customers during the coming winter as any alternative.[5] The current controversy centers on whether the stay in the Transco case should continue in effect, and if so, how it should be shaped to give protection against irreparable harm.

Our initial order in the Transco case was issued November 9, 1973. It was clarified on December 14, 1973, to make explicit our intent that the existing interim plan, which would have been replaced by the 467-type plan under the administrative orders in dispute, remain in effect "until further order of this court." In the fall of 1974 the Commission requested a further clarification of our stay, in light of ongoing negotiations between the pipeline and its customers to reach a new interim settlement plan. On October 4, 1974, we gave this explanation:

> Our orders of November 9, 1973 and December 14, 1973 do not permit the Federal Power Commission to impose

---

1. 49 F.P.C. 85 (1973).

2. 49 F.P.C. 583 (1973). These orders will be referred to collectively as Order No. 467 unless otherwise necessary for clarity.

3. After the promulgation of Order No. 467, Southern submitted a plan which it viewed as possibly within the scope of 467, although the plan provided for initial curtailment with regard to contractual entitlements rather than end use. Curtailments below firm contract commitments were to be made according to the 467 priorities. *See* Letter from Southern Natural Gas Company, March 29, 1973, *reprinted in* Brief for Respondent FPC (Nos. 74–1150, 74–1200), App.C. In submitting the plan, Southern requested the FPC to advise whether changes were necessary to bring the plan into compliance with 467. The Commission thought changes were necessary, and they were subsequently made.

4. Our understanding is that a stay was not granted in the third case, involving Panhandle, because at the time the petition for a stay was reviewed the disruption of the 467 plan then in effect by virtue of the Commission's orders of November 6 and December 28, 1973, would have been counterproductive. In oral argument, counsel for Panhandle stated that the 467 plan was workable under present circumstances, whereas the interim settlement plan previously in effect would not be adequate.

5. None of the parties in the Southern case has moved to dissolve this court's stay entered on January 28, 1974, and clarified on January 30, 1974. Nor have petitioners in the Panhandle case renewed their request for a stay.

a new interim plan on the Transcontinental Pipeline Corporation (Transco) for the year November 16, 1974 through November 15, 1975. . . . Our orders of November 9 and December 14 do not, however, prevent Transco from submitting a new interim plan to the Commission under section 4 of the Natural Gas Act, nor do they affect the Commission's power to implement such a plan or to suspend it pending hearings.

Meanwhile, on September 30, 1974, Transco had filed an interim settlement plan to supercede the one in effect. The Commission rejected the settlement on November 12, 1974.[6] Transco filed a 467-type interim plan the following day, stating that "the Commission having rejected the proposed interim settlement, Transco has no choice other than to make this filing. . . ."[7] The Commission's action of November 12, and the prospect that a 467 interim plan would be submitted and approved as a result, triggered a number of filings in this court. Petitioners and intervenors in the case moved to continue the *status quo*, asking in effect that Transco and the Commission be required to retain the existing interim plan. We responded provisionally in our order of November 15, 1974, in which we directed the parties to take no steps affecting the *status quo* pending further order of the court. The Commission has since moved for the immediate dissolution of all of our stay orders. And to complicate matters even further, Transco has filed an appeal from the Commission's order of November 12 and has also moved that we order the Commission to permit the pipeline to place the interim settlement into effect pending our adjudication on the merits.

■ Our consideration of the present motions takes place against the background of substantial claims raised by petitioners on the merits in these cases. Petitioners' chief claim is that the 467-type plans were not filed voluntarily by the pipelines but were the result of coercion by the FPC. *See* Moss v. CAB, 139 U.S.App.D.C. 150, 430 F.2d 891 (1970). If this is correct, of course, the plans are invalid, as the Commission cannot impose a change in an existing tariff without compliance with the requirements of section 5 of the Natural Gas Act, which the Commission admits were not met here. Petitioners point to evidence of arm-twisting, both in the language of Order No. 467–B itself[8] and in the circumstances under which the pipelines relented to the Commission's desires.[9] Transco's appeal from the November 12th order also presents a substantial question under Michigan Consolidated Gas Co. v. FPC,[10] which required that the Commission give reasoned consideration to settlement proposals offered by parties in proceedings before it. Although the Commission did "consider" the interim settlement agreement, its stated reasons for rejecting the plan may be inconsistent with prior FPC decisions[11] and do not include allocational considerations at all. Resolution of these substantial questions will require careful scrutiny of

---

**6.** Order Finding an Emergency on Transco's System and Denying Motion for Interim Settlement as to Curtailment Rules, FPC Docket No. RP72–99 (Nov. 12, 1974) [hereinafter cited as Order of Nov. 12, 1974].

**7.** Letter from Transcontinental Gas Pipeline Corporation, November 13, 1974, *quoted in* Motion to Continue Maintenance of the Status Quo of Piedmont Natural Gas Company, at 11.

**8.** Tariffs not in accord with the policies expressed in orders in Docket No. R–469 will be subject to suspension and hearing, and any curtailments made under nonconform-

ing tariff sheets which have not received Commission approval may be found to be unjust and unreasonable, or preferential and discriminatory, depending on the facts proved in an evidentiary hearing.

49 F.P.C. at 585.

**9.** In two cases, Transco and Southern, the pipelines were given written warnings by the FPC of the possible consequences of failure to comply with Order No. 467, with reference to the language quoted note 8, *supra*.

**10.** 108 U.S.App.D.C. 409, 283 F.2d 204, cert. denied, 364 U.S. 913, 81 S.Ct. 276, 5 L.Ed.2d 227 (1960).

**11.** *See* Order of Nov. 12, 1974, at 15.

the case law and the complex factual situations presented by each case.

■ The power of this court to grant injunctive relief *pendente lite* in cases seeking review of FPC orders was established in Virginia Petroleum Jobbers Ass'n v. FPC.[12] In ruling on the present motions involving our prior stay orders, we recognize that "it is principally the protection of the public interest with which we are here concerned [and] no artificial restrictions of the court's power to grant equitable relief in the furtherance of that interest can be acknowledged. * * * We must determine . . . how. the court's action serves the public best."[13]

■ A court not only has the authority to shape the contours and limit the duration of the relief granted by its order, but may "revoke or modify its mandate, if satisfied that what it has been doing has been turned through changing circumstances into an instrument of wrong."[14] As Justice Cardozo has observed, "[a] continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need."[15] We believe that this court not only has equitable discretion to respond to changing circumstances but has a responsibility to take corrective action when its prior orders threaten to foster rather than forestall irreparable harm.[16]

The marked deterioration in Transco's supply position during the year since our stay issued has altered circumstances dramatically.[17] Although the present interim plan performed adequately last winter, as evidenced by the absence of applications for extraordinary relief, submissions made in support of the Transco and FPC motions and in opposition to the North Carolina motion contain strong indications that continuation of the interim plan poses a substantial risk to high priority users. First, Transco has determined that the existing plan will not perform satisfactorily under present conditions. In testimony before the FPC, Mr. C. H. Mullendore, Jr., Vice President of Marketing for Transco, stated:

* * * I am not able to give assurance that, at the projected deeper levels of curtailment on Transco's system, the present interim plan would operate beyond November 15, 1974 in a manner to accomplish its basic objective of protecting all firm loads. This is so because the plan depends upon actual market conditions and there is no built-in mechanism for guaranteeing that all interruptible loads will be in fact curtailed to protect the firm loads of the rest of the system.[18]

Transco's conclusions, of course, reflect a pipeline's "unique knowledge of its customers' needs, ability to substitute other

**12.** 104 U.S.App.D.C. 106, 259 F.2d 921 (1958).

**13.** *Id.* at 109–110, 259 F.2d at 924–925.

**14.** United States v. Swift & Co., 286 U.S. 106, 114–15, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932).

**15.** *Id.* at 114, 52 S.Ct. at 462, *see* System Federation No. 91, Ry. Employees' Dep't v. Wright, 364 U.S. 642, 647, 81 S.Ct. 368, 371, 5 L.Ed.2d 349 (1961) ("There is also no dispute but that a sound judicial discretion may call for the modification of the terms of an injunctive decree if the circumstances . . . have changed, or new ones have since arisen.").

**16.** *Cf.* Natural Gas Pipeline Co. v. FPC, 128 F.2d 481, 484 (7th Cir. 1942) ("We think it well settled that in respect to review of orders of Federal Boards and Commissions, the jurisdiction of the Circuit Court of Appeals, when granted by Congress, is original rather than appellate in character and that, being endowed with original jurisdiction, the court may by its own orders protect the rights of the parties in any manner in which any trial court of equity of general jurisdiction might do so in an injunction suit.").

**17.** Transco estimates that the system-wide curtailment will be approximately 28% during the winter period and 40% for the following summer period. These levels of curtailment are approximately 50% above those experienced in 1973–74. *See* Affidavit of Eugene H. Luntey, President of Brooklyn Union Gas Company, at 2–3.

**18.** *See* Order of Nov. 12, 1974, at 18.

fuel sources, and other relevant considerations." [19]

Second, the FPC found in its November 12, 1974, order that "the currently effective interim plan will place firm service, including service to high priority customers, in jeopardy." [20] The Commission's determination, although based on an abbreviated record, was bolstered by data on the depth of the expected shortfall, motions opposing the existing plan filed by two of Transco's customers, numerous petitions for extraordinary relief from the interim plan, and the testimony of Transco's officer.[21]

Third, extensive affidavits appended to Brooklyn Gas Company's opposition to North Carolina's motion illustrate the threat to human needs users posed by a continuation of the present *pro rata* plan. For example, Elwin S. Larson, Senior Vice President of Brooklyn Union Gas Company, indicated that the curtailment required by the existing plan would "require physical termination of service to more than 11,000 small firm commercial and industrial customers, including essential government installations, schools, hospitals, apartment buildings, nursing homes, and the like." [22]

Fourth, it is significant that the parties supporting the present allocation scheme make no attempt to demonstrate the plan's ability to operate successfully during the upcoming winter. Instead, the submissions of North Carolina, South Jersey Gas Company, Piedmont Natural Gas Company, and South Carolina Public Service Commission focus on the irreparable harm threatened by implementation of a 467 plan.

■ After careful evaluation of the material made available for our consideration, we have concluded that the present stay cannot be continued and consequently reject North Carolina's motion. Were we simply to grant the FPC's request to dissolve the present stay, the Commission's May 23, 1973, and July 30, 1973, orders would serve, upon Transco's motion to effectuate its filing, to place in operation the 467 plan submitted on June 29, 1973.[23] We decline to pursue that course because of substantial indications that the 467 plan would also result in irreparable injury to Transco customers.

■ The 467 plan would appear to have an extremely harsh impact on North Carolina and South Carolina customers for two reasons. It is claimed that the 467 requirement that virtually all interruptible service be completely curtailed before cutbacks are made in firm service would have a drastic impact on many of the region's human needs users. The 467 treatment of interruptible customers is based on the Commission's findings in its *Arkansas-Louisiana Gas Company* decision that those customers "who require gas for human needs service or nonsubstitutable industrial service do not contract on an interruptible basis." [24] Piedmont contends, however, that many human needs users in North Carolina have chosen the lower interruptible rates in reliance on the historical availability of sufficient gas purchased on that basis. The affidavit of Earl C. Chambers, Piedmont's Senior Vice President for Supply and Technology, details the impact of a 467–B plan on Piedmont's "interruptible" customers.

During the 1974–75 winter, Piedmont will lose 37.81% of gas currently being sold to customers in Order No. 467–B's category 2. As a result, Piedmont will be forced to completely curtail services to 31 hospitals, three water pumping plants serving the entire city of

19. FPC v. Louisiana Power & Light Co., 406 U.S. 621, 645, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972).

20. See Order of Nov. 12, 1974, at 17.

21. See *id.* at 5–6, 8–9, 18.

22. See Affidavit of Elwin S. Larson, at 2–3.

23. See Motion of Federal Power Commission for Immediate Dissolution of Stay Orders at 10. In the unlikely event that Transco failed to move to effectuate its filing, there would be no curtailment plan in effect to apportion its gas supply.

24. See 49 F.P.C. 85, 86 (1973).

Greensboro, North Carolina, a city with a population of approximately 180,000, four sewage treatment facilities, three nursing homes, two state boarding schools for the physically handicapped, and one state prison.

Although these customers have historically purchased gas under "interruptible" rate schedules, the majority of these customers have historically been curtailed only a few days each year. As a result, most of these essential public service institutions do not have, nor can they readily obtain, sufficient alternate fuel capabilities to permit them to offer uninterrupted service if they are completely curtailed by Piedmont. * * *

Under the proposed Order No. 467–B plan, Piedmont will be forced to curtail approximately 425 "interruptible" customers in Order No. 467–B categories 3–9 365 days a year. This loss of gas by these customers would severely limit their ability to continue operations. Although these customers are classified as "interruptible", this description is valid only in the very limited sense that they do not expect to receive natural gas from Piedmont 100% of the time. In recent years these customers have purchased natural gas supplied by Piedmont to supply from 60% to over 90% of their energy requirements.[25]

In addition, the 467 plan does not take into account the fact that some customers are totally dependent on Transco while others purchase substantial quantities from pipelines supplying a much higher percentage of contract demand. The Piedmont brief illustrates the disparity resulting from the failure of the 467 plan to take account of other suppliers.

[S]ince the projected curtailment on the Transco system is one of the deepest, if not the deepest, of all pipeline curtailment, the fact that North Carolina Intervenors are dependent entirely upon Transco for their gas operation [sic] to accentuate the disparity of the impact upon them. For example, in contrast to the North Carolina Intervenors, Washington Gas Light Company receives only 17% of its gas from Transco and the remaining 83% of its gas from Columbia which curtailed its customers only 2% last winter and is projecting curtailment of only 14% for the coming winter. Consequently, even if Washington Gas Light was to be curtailed by Transco by the same percentage as Piedmont [44.67%], it would nevertheless still receive 81% of its gas requirements. The fact is that under Transco's 467–B plan Washington Gas Light's curtailment by Transco will only be 16.9% so that it will in fact receive 85.76% of its gas requirements.[26]

Similar allegations of irreparable injury are made by customers in other areas.[27]

The inadequacy of the 467 plan is also suggested by the two primary factors relied upon by the FPC to condemn the present interim plan—the testimony of Transco's officer and the petitions for extraordinary relief. Mr. Mullendore, the Transco executive, commented on the 467 plan as follows:

The record shows that strict adherence to an Order No. 467 plan at the levels of Transco's curtailment would mean that customers wholly dependent on Transco for their supplies would not receive sufficient quantities of gas to serve their reported requirements in Priority 2, which contains requirements for large commercial markets,

25. See Affidavit of Earl C. Chambers, at 13–14.

26. See Piedmont's Motion to Continue Maintenance of the Status Quo, at 28–29.

27. See Response of Intervenor South Jersey Gas Company at 6 ("South Jersey projects

that presently foreseeable curtailments under the 467–B plan would cause direct unemployment of more than 35 percent of the approximately 25,000 man workforce employed by its large industrial customers.") and accompanying affidavits.

storage injection requirements and firm industrial uses for feedstock, plant protection and process uses. Such a situation would likely precipitate the filing of numerous petitions for extraordinary relief which, if granted even in part, would have a snowballing effect because of the impact of such relief on other customers.[28]

These predictions appear well founded in view of the allegations of the North Carolina Intervenors and the fact that each of the present petitioners for extraordinary relief would receive even less gas this coming year under a 467 curtailment plan.[29] Although the FPC's November 12 order indicated that the Commission believes that "curtailment on the basis of end use [467–B] priorities affords the best interim protection for consumers," that belief appears to be premised on the Commission's general policy statement rather than an examination of evidence pertaining to the Transco system.[30]

▆▆▆ In an attempt to discharge our responsibility to protect the parties and the public from the threat of irreparable injury presented by the continuation or dissolution of our existing stay, we order that our stay be modified to place the allocation scheme contained in the September 30, 1974, settlement agreement in effect pending further order of this court. This curtailment plan is the product of months of negotiations between Transco and its customers. It has the advantage of their intimate knowledge of the Transco system and their under-standing of the practical problems created by the anticipated shortfall.[31] That it is a balanced and workable product of this expertise is strongly suggested by the fact that all but one of Transco's customers filing comments with the FPC supported or acquiesced in the settlement plan, and the lone dissenter has made no claim of irreparable injury either to the Commission or this court. Opponents of both the present plan and the 467 plan agree that the settlement will avoid irreparable harm.[32]

The Commission has made no findings with respect to the settlement agreement's allocation scheme. Its November 12 order rejecting the agreement went no further than stating that "the proposed scheme of compensation, which is the cornerstone of the settlement, is patently unlawful and beyond our jurisdiction to either approve or enforce."[33] At oral argument, Transco and the other parties suggested that the FPC's objections could be met by placing funds in an escrow account pending a determination of the procedure's legality. We accept this suggestion and invite the parties to submit forms drawn to carry out the escrow arrangement. We also accede to Transco's request that our order be effective as of November 16, 1974, the beginning of Transco's winter season, to facilitate adjustments required to assure that customers receive allotments provided for in the settlement agreement.

The information on which we act is admittedly incomplete; it has not been

---

28. *See id.* at 4 (quoting Mullendore testimony).

29. *See id.* at 5; Piedmont's Motion to Continue Maintenance of the Status Quo at 21.

30. *See* Order of Nov. 21, 1974, at 17.

31. *See* FPC v. Louisiana Power & Light Co., 406 U.S. 621, 645, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972).

32. *See, e. g.,* Piedmont's Motion to Continue Maintenance of the Status Quo at 35 ("[W]e believe that no such irreparable injury will result to other customers of Transco should the curtailment plan on the Transco system pending completion of Court review in the instant proceeding be . . . the interim settlement plan [the September 30, 1974 settlement agreement]."); Affidavit of Eugene H. Luntey, President of Brooklyn Union Gas Company, at 4.

33. *See* Order of Nov. 12, 1974, at 13.

fully tested, and there may be weaknesses or lacunae of which we are not aware. The Commission has available to it a full evidentiary record from hearings on the permanent curtailment plan proposed by Transco. That record, which was closed on July 11, 1974, contains over 6200 pages of transcript and 120 exhibits.[34] Our present action in placing into operation the allocation plan contained in the settlement agreement in no way precludes the Commission from modifying the settlement plan or taking other action based on the information which it has generated and is peculiarly in a position to sift and evaluate.

There is no possibility that the current proceedings will yield a decision on the proposed permanent plan in time for this winter. But the Commission asserts, and we agree, that it has residual emergency powers to impose an interim plan where there is no adequate alternative.[35] Such powers must be carefully confined,[36] but a shortage on the Transco system of what appears to be crisis proportions provides sufficient predicate for their exercise. Nor do we think their exercise is precluded in this case by American Smelting & Refining Co. v. FPC, 161 U.S.App.D.C. 6, 494 F.2d 925, 933 (1974), which stated that the Commission could not impose an interim curtailment plan, even under emergency conditions, without complying with the hearing requirements of section 5(a). Here a hearing on the relevant issues has been completed. We think the record compiled provides a valid basis on which the Commission, under the conditions which now confront Transco's customers, could issue interim orders effectuating a plan which

does not comport with the one submitted by the pipeline.

This recognition of latitude in the Commission may relieve the frustration which the Commission has felt as a result of our prior orders. At the same time, we must caution restraint lest the FPC interpret our action as a license to require adherence to the 467 paradigm without regard to the peculiarities of the Transco system and its customers. As we stated in Pacific Gas and Electric Company v. FPC, 506 F.2d 33 (D.C.Cir. 1974),

> A policy statement announces the agency's tentative intentions for the future. When the agency applies the policy in a particular situation, it must be prepared to support the policy just as if the policy statement had never been issued.

We set forth evidence indicating problems posed by the unqualified application of Order No. 467 in this case. This evidence, as well as the doctrine of *Michigan Consolidated Gas Co.*,[37] require that the Commission give full consideration to the interim settlement agreement and take a fresh look at the 467 priorities in the context of the Transco system. Any curtailment plan imposed by the Commission will be reviewed by this court to ensure that such consideration has been given, and that the plan is supported by the record.

In view of the severe time restraints imposed by these emergency conditions, the justifications offered by the Commission in support of its actions need not be as elaborate as required for the implementation of a permanent curtailment

---

**34.** Motion to Continue Maintenance of the Status Quo of Piedmont Natural Gas Company, at 7.

**35.** *See* FPC v. Louisiana Power & Light Co., 406 U.S. 621, 644 n. 18, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972), *citing* FPC v. Natural Gas Pipeline Co., 315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037 (1942).

**36.** *See* Pennsylvania Gas & Water Co. v. FPC, 133 U.S.App.D.C. 298, 427 F.2d 568 (1970) (holding that FPC's authority to grant certificates on an emergency basis under section 7(c) of the Natural Gas Act did not provide a basis for changes in certificates going beyond the current exigencies).

**37.** *See* text accompanying notes 10–11, *supra*.

plan.[38] The presence of such restraints, however, does not allow the court to dispense with review of the Commission's decision to determine the adequacy of the justifications presented.

All of the parties to this proceeding are keenly aware of the circumstances requiring speedy determination of the interim curtailment plan to be in effect on the Transco system this winter. On November 12, the Commission warned that "the interim plan to be followed for this winter—whatever its nature—must be placed into effect on or before November 30, 1974. Transco and its customers must be given sufficient time to prepare for the harsh months ahead. Moreover, a switch of curtailment plans during mid-winter will create operational chaos and exacerbate, rather than alleviate, irreparable harm."[39] We have been guided by this warning in resolving the conflicting motions expeditiously. We trust that the Commission, freed from the bonds of our prior stays, will heed its November 12 declaration and act promptly in exercising its emergency powers to fashion an interim plan, should it believe that a plan that differs from this court's order is necessary to protect the public served by the Transco system. In view of the exigencies of the present situation, any Commission action shall be certified forthwith to this court and shall be effective only upon order of this court modifying the stay announced in this opinion.

· Our order is not intended to restrict in any way the Commission's powers to respond to petitions for emergency or extraordinary relief from the curtailment plan placed in effect by this opinion.

So ordered.

---

**38.** *See* Moss v. CAB, 139 U.S.App.D.C. 150, 430 F.2d 891, 901 (1970) ("We would be sympathetic, for example, to instances in which the Board felt that compelling circumstances required it to act without complete information before an investigation is completed."); National Air Carrier Ass'n v. CAB, 141 U.S. App.D.C. 31, 436 F.2d 185, 194–195 (1970)

(recognizing the Board's power to take interim action on a fare agreement under exigent circumstances even though it "lacks sufficient information to determine authoritatively whether the agreement as a whole will serve the public interest . . . .").

**39.** Order of Nov. 12, 1974, at 19.