**SEBRING UTILITIES COMMISSION et al., Petitioners,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

**Nos. 77–2911, 77–2972.**

United States Court of Appeals,
Fifth Circuit.

March 20, 1979.

Robert A. Jablon, Washington, D. C., for Sebring Utilities, Fort Pierce Utilities.

Charles F. Wheatley, Jr., Stanley W. Balis, Washington, D. C., for Lake Worth Utilities.

Phil W. Jordan, Chas. E. McGee, Washington, D. C., for Gardinier, Inc.

Robert R. Nordhaus, Philip Telleen, McNeill Watkins, II, Washington, D. C., for FERC.

Wm. P. Diener, Winter Park, Fla., for Fla. Gas Transmission.

Peyton G. Bowman, III, Richard M. Merriman, Washington, D. C., for Fla. Power & Light Co.

Wm. I. Harkaway, Washington, D. C., for City Gas Co. of Fla.

Stephen A. Herman, Washington, D. C., for Rinker Portland Cement.

Geo. B. Mickum, III, Washington, D. C., for Abitibi Corp.

Ned Willis, Perry, Iowa, for Southern Gas Co., Gainesville Gas Co., Gulf Natural Gas Corp.

James U. Hamersley, Alexandria, Va., for Alumax, Inc.

Paul W. Fox, Washington, D. C., for Peoples Gas System, Inc.

Francis H. Caskin, Washington, D. C., James D. Olsen, Dallas, Tex., for Sun Oil Co.

Carroll L. Gilliam, Washington, D. C., for Amoco Production Co.

Before BROWN, Chief Judge, GODBOLD and RONEY, Circuit Judges.

JOHN R. BROWN, Chief Judge:

The Federal Energy Regulatory Commission (FERC) issued several opinions and orders[1] in which it (1) found Florida Gas Transmission Company's (FGT) gas curtailment plan to be unduly discriminatory and (2) disclaimed jurisdiction to order curtailment of gas FGT merely transports. In this case, several parties—[2] aligning themselves in different camps on different issues—seek review of those opinions. While some argue that substantial evidence does not support the Commission's holdings, others insist that the Commission has erred in not immediately implementing its orders. Finding that it has struck a proper balance, we affirm the Commission on all points.

FGT operates a natural gas pipeline that serves several areas of Florida. It sells both to distributors (who in turn sell to residential, commercial, and industrial customers) and directly to some large industrial concerns.[3] It also transports gas for two major electric generating companies, Florida Power Corporation (FP) and Florida Power and Light (FPL), both of which buy large amounts of gas in Texas.[4]

FGT has fixed various rate schedules and degrees of reliability of service in its sales contracts. Wholesale distributors may purchase gas under the G schedule, which provides firm general service, and the I schedule,[5] which offers gas for resale to preferred interruptible resale customers. Direct customers may also purchase either

1. Opinion No. 807, issued June 24, 1977; Opinion No. 807–A, issued September 22, 1977; Order Denying Rehearing in Docket No. RP75–79, issued November 21, 1977; Order Dismissing Petition and Complaint, Granting Motions to File Response, and Permitting Interventions in Docket No. CP77–147, issued August 3, 1977; and Order Denying Applications for Rehearing and Denying in Part Motion for Clarification in Docket No. CP77–147, issued September 30, 1977.

2. For ease of identification, we denominate the three issues (which will be explained more fully in the text of the opinion) as (i) undue discrimination, (ii) immediate implementation, and (iii) transportation gas.

   (a) Attacking the Commission's finding of undue discrimination are City Gas of Florida, Southern Gas, Gainesville Gas, Gulf Natural Gas, Lake Worth Utilities, and Utilities Commission, City of New Smyrna Beach, Florida.

   (b) Only Gardinier challenges the Commission's failure to require immediate implementation of an interim plan to remedy the "undue discrimination." City Gas, Lake Worth Utilities, Peoples Gas System, Gainesville Gas Company, Southern Gas Company, Gulf Natural Gas Corporation, and Utilities Commission, City of New Smyrna Beach, Florida, all support the Commission on that point.

   (c) Regarding the issue of transportation gas—that is, transportation of gas owned by FP and FPL—Abitibi Corporation, Sebring Utilities Commission, Fort Pierce Utilities Authority, Gainesville-Alachua County Regional Water, Electric & Sewer Utilities, Lake Worth Utilities, Utilities Commission, City of New Smyrna Beach, Florida, and Cities of Homestead, Kissimmee, Lakeland, Starke and Talla-

hassee (Florida Cities) challenge the Commission's holding. Sun Oil Company, Amoco Production Company, and Florida Power and Light Company, on the other hand, all intervene in support of the Commission's decision.

   Since some of the parties change sides on the issues, we asked that they organize their briefs and arguments according to issues rather than parties. We similarly structure the opinion. As such, the case proved the value of our Local Rule 24(g), which allows the Court to call a prehearing conference. The conference held in this case was conducted by a member of this panel and was attended by all counsel.

3. FGT began its pipeline operations pursuant to Commission authorization issued December 29, 1956. At that time, the Commission recognized that because of Florida's mild weather and relatively low level of industrial development, small load requirements would make it difficult for the pipeline to operate efficiently. It therefore certificated the pipeline's transportation of large quantities of gas purchased by FP and FPL for ultimate use as boiler fuel in generating electricity. (FP had contracted with Sun Oil Company and Pure Oil Company to purchase gas from Southern Louisiana reserves. FPL had contracted with Sun to purchase gas from South Texas fields. Both power companies had contracted with FGT to transport this gas).

4. FGT transports this gas under transportation rate schedules T–1, T–2, and T–3.

5. Only customers that also buy schedule G gas may buy schedule I gas. Schedule I gas costs less than gas sold to direct industrial customers.

interruptible[6] or firm service.[7] Under FGT's tariff,[8] in case of gas shortages, it will curtail deliveries to its customers in the following order:[9] (1) primary interruptible direct customers, (2) preferred interruptible direct, (3) distributors purchasing under schedule I, (4) firm direct industrial, (5) distributors purchasing under schedule G (for resale to firm customers).

Prior to 1972, FGT contemplated—and experienced—only relatively short term curtailments of its interruptible customers. Because it did not foresee any gas supply shortage, it expected to deliver substantially all of its contract volumes. In 1973, however, FGT curtailed its direct interruptible customers twice as many days as it had in 1972. In 1974, that figure almost doubled again.[10]

On March 21, 1975 Lehigh Portland Cement Company,[11] a direct interruptible customer of FGT, filed a complaint under Section 5(a) of the Natural Gas Act [12] (the Act), asserting that FGT's curtailment plan unlawfully discriminates against direct industrials in favor of indirect industrials purchasing from distributors. It argued that because the plan curtails gas without re-

---

**6.** There are two classes of interruptible service: primary and preferred. During the years 1962 through 1971, FGT served another class of customers—intermediate interruptible. According to petitioners' brief on the undue discrimination issue, there have been no customers in this class since 1971.

In 1962 FGT adopted a policy of making industrial sales through distribution companies whenever possible. If a potential customer were located in an area served by one of FGT's wholesale customers, it would refer the new company to the distributor. If not, FGT would sell directly. Thus, geographical location of the industrial customers determined whether they would buy directly or indirectly.

**7.** More specifically, FGT offers three broad classes of service:

   a. Transportation for Florida Power and FPL of gas purchased by the utilities in the field.

   b. Wholesales to local distributors for resale. These fall into two categories:
Firm service—under rate schedule G. This resale firm service is basically to residential and small commercial users. (R. 1688–90, 537).
Interruptible service—under rate schedule I. This resale interruptible service is generally to industrial and small commercial users. (R. 1691–94, 1515–28).

   c. Sales directly to the ultimate consumer. Firm service—very small volumes of gas are sold directly on a firm basis (see R. 1504–05, 1511).
Interruptible service—direct sales, primarily to industrial customers (R. 1512–13).

**8.** FGT filed its current curtailment tariff in response to the Commission's order No. 431. The Commission took no action with respect to the filing.

**9.** As the D.C. Circuit explained in *North Carolina v. FERC*, 1978, 190 U.S.App.D.C. 22, 26, 584 F.2d 1003, 1007,

[w]hen a pipeline company's natural gas supplies become inadequate to meet contractual commitments to customers, there must be provision—through a curtailment plan—for apportioning the diminishing gas supply among the customers.

**10.** The actual figures were as follows:

| | |
|---|---|
| 1972 | 60.6 days |
| 1973 | 120 days |
| 1974 | 211.6 days |
| 1975 | 287.5 days (estimated) |

**11.** Lehigh is now Rinker Cement Company.

**12.** 15 U.S.C.A. § 717d(a):

(a) Whenever the Commission, after a hearing had upon its own motion or upon complaint of any State, municipality, State commission, or gas distributing company, shall find that any rate, charge, or classification demanded, observed, charged, or collected by any natural-gas company in connection with any transportation or sale of natural gas, subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order: *Provided, however,* That the Commission shall have no power to order any increase in any rate contained in the currently effective schedule of such natural gas company on file with the Commission, unless such increase is in accordance with a new schedule filed by such natural gas company; but the Commission may order a decrease where existing rates are unjust, unduly discriminatory, preferential, otherwise unlawful, or are not the lowest reasonable rates.

gard to end-use,[13] it should be found unjust, unreasonable, unduly discriminatory, and preferential. The Commission set the matter for formal hearing on its own motion, and on August 5, 1976, the Presiding Administrative Law Judge issued a decision dismissing the complaint.

The Commission, however, reversed the ALJ in its Opinion No. 807. Announcing that "those who are similarly entitled must be treated equally regardless of their ability to survive otherwise," it found FGT's plan unduly discriminatory and ordered it to file a new plan that would provide equal treatment of direct and indirect customers who make similar use of the gas.[14] The Commission further ordered that FP and FPL be joined as parties so that all gas transported by FGT could be made part of the new plan.

After several parties petitioned for rehearing, the Commission issued Opinion No. 807–A, which affirmed its previous holding that FGT's curtailment plan was no longer just and reasonable, but rescinded its order that the pipeline file a new plan. It instead determined that the existing cur-

tailment should remain in effect until the § 5 hearing was completed or pending further Commission order. In addition, 807–A summarily reversed the Commission's prior decision to include the FP and FPL transportation gas in any new plan.[15] Numerous interested parties filed petitions for review in this Court.[16]

On January 18, 1977, in an independent proceeding, the Fort Pierce Utilities Authority of the City of Fort Pierce filed a petition and complaint. It requested (1) that the Commission order curtailments of the transportation gas on FGT's system, and (2) that the Commission condition further transportation upon FGT's curtailing the transportation volumes proportionately with those to which preferred interruptible customers would be otherwise entitled.[17] The Commission issued an order dismissing the claim on August 3, 1977, and denied rehearing on September 30, 1977. In both orders it found that it lacked the authority to grant the requested relief. It reasoned that because FGT does not own the transportation gas, it cannot allocate it. Moreover, legal title passes before the gas flows interstate. Again, several parties peti-

---

**13.** *See North Carolina v. FERC,* 1978, 190 U.S. App.D.C. 22, 26, 584 F.2d 1003, 1007:

By the "end-use" approach various uses of natural gas are ranked according to their essentiality or desirability, and allocation is first made to the highest priority use, then if supplies are sufficient, to the next highest use, and so on down the line until supplies are exhausted. Most pipeline customers are distributor companies which resell the gas to ultimate consumers; therefore, under the end-use approach, the extent to which a pipeline's distributor customers are curtailed depends on the "mix" of each distributor's own customers. Distributors who have a large percentage of high priority customers theoretically will not be curtailed as deeply as those who have a small percentage of such customers, and distributors who have a large percentage of low priority customers will be curtailed more sharply than those who have a small percentage of such customers. The object of an "end-use" plan is to ensure that higher priority uses are completely supplied before lower priority uses are served.

In Order No. 467, 49 FPC 85 (1973), as modified by Order No. 467–B, 49 FPC 583 (1973), the Commission announced a policy of favoring

curtailment priorities based on the purposes for which the gas would be used. These orders will be referred to collectively as Order No. 467 unless otherwise necessary for clarity.

**14.** In connection with this order, the Commission determined that a hearing should be held on a new curtailment plan. The ALJ had phased the evidentiary hearing so that if he determined in Phase I that the existing plan were unduly discriminatory, he would hear evidence on a new plan in Phase II. Because of his initial determination, the record contained no evidence on a new plan.

**15.** On November 21, 1977 the Commission denied petitions for rehearing of Opinion No. 807–A.

**16.** These were filed as Case No. 77–2911.

**17.** Petitioners were not complaining that FGT's pipeline had inadequate capacity to carry gas for all of its customers. They instead wanted the Commission to order reallocation of portions of FP's and FPL's gas to FGT's sales customers.

tioned this Court for review of the Commission orders.[18]

## Undue Discrimination [19]

In attacking the Commission's finding, that FGT's plan is unduly discriminatory, petitioners [20] first contend that FERC evaluated FGT's curtailment plan against an incorrect standard, and that it improperly shifted the burden of proof in its proceedings. They cite the Commission's statement in Opinion 807, that "there is a heavy burden to show that a non-end-use plan is superior," and contend that it demonstrates that the Commission elevated its statement of policy—as announced in Order 467, favoring end-use considerations [21]—to a legal presumption. Moreover, it compelled the supporters of the status quo to prove that the plan met the standard rather than imposing the burden of proving violation on those seeking to change the curtailment.[22] Such arbitrary action,[23] they insist, merits reversal of the Commission's decision.

We cannot agree. We think the Commission correctly applied the § 4(b) standard as it interpreted it.[24] An examination of Opinions 807 and 807–A reveals that the Commission initially found a preference unsupported by a reasonable basis for distinction, and *then* determined that an end-use plan would be appropriate for rem-

18. These were filed as Case No. 77–2972. On March 20, 1978, this Court consolidated this case and No. 77–2911.

19. Before addressing the issues, we wish to point out that we find each reviewable. At our prehearing conference, held March 3, 1978, *see* note 2, *supra*, we requested that the parties argue in their briefs the question whether each issue is reviewable. They ably complied with our request, thus aiding us in reaching the conclusion that each is ripe for review. Regarding each question, the Commission has rendered a determination sufficiently final and definitive to invoke this Court's jurisdiction. *See Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic,* 1970, 400 U.S. 62, 71, 91 S.Ct. 203, 209, 27 L.Ed.2d 203, 210. *See also Magnolia Petroleum Co. v. FPC,* 5 Cir., 1956, 236 F.2d 785, 793 (Brown, Judge, dissenting).

20. *See* note 2(a), *supra.*

21. Petitioners point out that, according to the Court of Appeals for the District of Columbia Circuit, the FERC General Statement of Policy does not carry the force of law. It "is merely an announcement of a policy which the agency hopes to implement in future rulemakings or adjudications." *Pacific Gas & Electric Co. v. FPC,* 1974, 164 U.S.App.D.C. 371, 376, 506 F.2d 33, 38.

22. Citing our prior opinions in *Louisiana v. FPC,* 5 Cir., 1974, 503 F.2d 844, 866, and *Louisiana Power and Light v. FPC,* 5 Cir., 1976, 526 F.2d 898, 900–08, petitioners emphasize that those wishing to change an existing plan must shoulder the burden of proving it unjust and unreasonable.

23. Petitioners attempt to highlight this alleged arbitrariness by citing the Commission's "Order Granting Motion to Dismiss Complaint and Request for Order to Show Cause and Permitting Interventions," issued May 12, 1977, in *General Motors Corp. v. Natural Gas Pipeline Co. of America,* Docket No. RP76–86 ("Order No. 467 . . . was not intended to initiate a proceeding or to provide a binding rule without further proceedings directed toward curtailment problems of specific pipelines.") Opinions 807 and 807–A, they argue, are clearly inconsistent with *General Motors.*

FERC, however, distinguishes *General Motors* on the ground that the issue of undue discrimination had not been raised in those proceedings. The Commission dismissed the complaint primarily because "General Motors' complaint fail[ed] to disclose the presence of any direct, immediate injury that General Motors can sustain from the continuance of Natural's currently effective curtailment program."

24. We recognize that much of the Commission's language, especially in opinion 807, reflects the Commission's preference for an end-use plan. We think, however, that one statement clarifies FERC's approach:

> In the opinion of the Commission it is not necessary to show higher overall costs of doing business or a competitive disadvantage in order to prove undue discrimination or preference in favor of others. The essence of the principle is that those who are similarly entitled must be treated equally regardless of their ability to survive otherwise.

Thus it appears that the Commission deems § 4(b) to be calling for equal treatment of those who use gas (or who are entitled to it) in similar ways. It is enforcing its interpretation of the statutory standard, and we cannot say that its interpretation is unreasonable. Order 467 merely represents the Commission's view of a way to enforce that standard.

edying the discrimination.[25] In 807 it examined the similarities between two cement plants—one an indirect customer of FGT, the other a direct—and found no statutorily acceptable reason for the indirect customer's receiving almost twice as much FGT gas as the direct.[26] It made this finding before discussing "the necessity for an end-use plan." [27] In 807–A the Commission, apparently trying to clear up any confusion caused by Opinion 807, carefully delineated its two findings:

> . . . the Commission said [(1)] that the [FGT curtailment plan] discriminates against its direct sale customers in favor of indirect customers, who receive gas on resale from distributing companies, and [(2)] that FGT must file a curtailment plan based on end-use of the gas providing equal treatment for direct and indirect customers making similar use of the gas.

■ Regarding the contention that the above-quoted sentence shows that the Commission shifted the burden of proving violation of the Act, we first emphasize that it made this statement while discussing the sort of plan FGT should submit in place of the present one. It had *already* found a violation of the Act. Next, we point to the Commission's answer to this very claim in Opinion 807–A, in which it said that

> [w]e recognize that the complainant has the burden of proof and that Order No. 467–B merely states our policy. We think, however, that the *complainants have met their burden* of showing that while they operate in like manner as the indirect customers they receive a smaller share of gas.

Op. 807–A, slip op. at 7, emphasis added.

■ Petitioners level their second attack against Opinions 807 and 807–A by arguing that, contrary to the Commission's findings, a reasonable basis did support the admitted discrimination.[28] They point to the history of the pipeline and the unique economic difficulties involved in supplying gas to Florida, contending that these factors militate against a change in the present system.

Because Florida experiences generally mild weather conditions with occasional drastic changes in temperature, temperature sensitive loads may swing annually as much as about 800%. In order to serve these loads efficiently, therefore, FGT distributors had to sell to customers who would accept interruptible service. In other words, in order to maintain dependable deliveries to those serving residential and other high priority users, the pipeline had to develop an industrial market that would use large amounts of available gas but could be curtailed during gas shortages.[29] Thus, say

---

**25.** This Court has recognized that end-use priorities constitute a "most appropriate consideration for purposes of a curtailment plan." *Louisiana v. FPC,* 5 Cir., 1974, 503 F.2d 844, 858.

**26.** Op. 807, slip op. at 7–9.

**27.** Op. 807, slip op. at 11.

**28.** While admitting that the plan *does* discriminate, petitioners correctly point out that more is required to violate the Act. Section 4(b) prohibits *undue* discrimination, preference without a reasonable basis:

> (b) No natural-gas company shall, with respect to any transportation or sale of natural gas subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

15 U.S.C.A. § 717c(b).

**29.** According to petitioners, FGT has worked to further this policy by its practice of encouraging industrial sales through wholesale distributors. If they experience curtailments of supply, these distributors will then pass on the curtailments to their resale industrial customers before their resale residential customers. In the meantime, FGT's direct industrial customers, by suffering the greatest curtailments, support the establishment of the resale markets. Theoretically, then, as resale markets grow, direct markets will be curtailed out of existence. (The Commission denies that phase out was ever a purpose of the plan. It instead contends that FGT intended to serve *all* loads, direct and indirect).

Petitioners argue that the direct customers, by paying a lower price for their gas, bargained for this greater degree of curtailment. We, however, agree with the Commission's observation, in Opinion 807, that

> [e]ven if the direct sales customers could be found to have entered into contracts with

petitioners, the plan does work to protect high priority users.

While we recognize—as does the Commission—that the present plan may favor some high-priority users,[30] we do not agree that discrimination against direct customers is necessary to secure this protection.[31] And although we accept the contention that industrial loads may be necessary to enable the pipeline and its distributor-customers efficiently to offer residential and commercial service, we cannot make the leap necessary to conclude that this necessity requires

favoring distributor-supplied industrials over those who buy directly.

■ Petitioners offer the argument that many of the distributors would face bankruptcy if they were curtailed to the extent that their industrial customers received gas supplies on an equal basis with direct industrials. Here, again, we agree with the Commission that there is now insufficient basis for such a contention. Until the FERC holds hearings specifically to study possible plans and their effects, assertions of adverse impact on particular distributors is speculation.[32] Moreover to the limited

---

FGT directly in order to obtain certain advantages such as a lower price for gas or the option to use oil, which was then less expensive than gas, circumstances changed radically and what may once have been a non-discriminatory contract would have become a discriminatory one.

At the time the direct customers negotiated their contracts, they *and* FGT contemplated only short curtailments, mostly related to pipeline capacity. As the demand for gas grew, the pipeline would periodically expand capacity. In the context of a severe gas shortage and the resultant need rationally to allocate a disappearing commodity, the parties (and the Commission) must consider different factors than they would in allocating the inconvenience that accompanies periodic expansion of facilities. *See Consolidated Edison Co. v. FPC,* 1975, 168 U.S.App.D.C. 92, 102, 512 F.2d 1332, 1342 ("The shortage itself appears to have come with a suddenness and severity which the agency failed to anticipate. With it, came the recognition that in the absence of some guidance from the Commission, the allocation of scarce supplies might be too much governed by concentrated economic interests rather than the public interest generally.") *See also American Smelting & Refining Co. v. FPC,* 1974, 161 U.S.App.D.C. 6, 15, 494 F.2d 925, 934, *cert. denied,* 419 U.S. 882, 95 S.Ct. 148, 42 L.Ed.2d 122, in which the court observed that

[t]he short answer to this argument [that a Commission-imposed curtailment system disrupts contractual relations of the parties] is that the Commission is not bound by agreements among parties subject to its jurisdiction. Section 5(a) of the Act gives the Commissioner authority to override discriminatory contractual arrangements . . . . .

      *    *    *    *    *    *

to the extent that the illegal curtailment plan was reflected in customer contracts, such contracts were also superseded by the Commission's orders.

**30.** We must again emphasize that the Commission did *not* make its finding of undue discrimination on the ground that FGT did not employ an end-use plan. It instead found that an end-use plan would remedy the unjustified discrimination.

**31.** Petitioners argue that the Commission recognized the reasonableness of the existing plan in Opinion No. 611, in which it rejected the City of Gainesville's (a direct industrial user) claim that "the same priority of service should be assigned to both resale I gas and the direct sale preferred interruptible gas." Florida Gas Transmission Co., Opin. No. 611, 47 FPC 341, 380 (1972). (The Commission denied rehearing of Opinion 611, by order issued January 19, 1973, after having issued Order 467).

The Commission distinguishes Opinion 611 by pointing out that Gainesville had presented its discrimination claim in terms of a rate differential rather than a disparity of curtailment. It had complained that because it had to pay more than the price of schedule I gas, it should enjoy curtailment priority at least equal with that of the resale industrials. The Commission, however, explained that

[t]he I service is different from the direct preferred interruptible service. To qualify for it the distributor must purchase higher priced G service whereas the direct interruptible customers need not do so. Furthermore, the I rate has been held low to make it competitive with other fuels * * *. We conclude, therefore, that the tariff should not be changed with respect to priorities on curtailment *at this time.*

(emphasis added).

Moreover, as of the date of Opinion 611, Gainesville had experienced almost no curtailment of gas supplies. Cf. note 10, *supra.*

**32.** We find nothing in the record that indicates (as petitioners appear to imply) that residential consumers will no longer receive gas if resale

extent that the record reflects the effect of the Commission's decision, it indicates that a 467 priority plan would provide to over seventy-five percent of the distributors on FGT's system more gas than they would have under the present tariff.[33]

■ Petitioners finally contend that Opinions 807 and 807–A are unlawful because direct and indirect customers—between which the Commission found undue discrimination—are not in the same class for the purposes of the Act. They are thus not legally comparable. Labeling the indirect industrials "non-customers," petitioners contend that the Commission should compare curtailment only between "customers" —i. e., direct industrials and wholesale distributors. Since the *distributors* determine the extent of curtailment after *they* receive the gas, FGT's tariff does not determine the extent of curtailment to resale users.

We have no trouble dispensing with these contentions. First of all, the Supreme Court has recognized Commission authority over curtailments of both direct and indirect customers. *FPC v. Louisiana Power and Light Co.,* 1972, 406 U.S. 621, 92 S.Ct. 1827, 32 L.Ed.2d 369. FGT's particular system of distribution has divided a group of similarly entitled [34] consumers into categories based on rates and dependability of service. It has also determined *when* indirect industrials will be served by creating a special rate schedule for indirect interrupti-

ble customers (most of which are industrial) and making it part of its curtailment priority order. Thus, by establishing the schedule I and G rates, the pipeline took an affirmative part in determining the flow of gas to indirect industrials. In such a situation, we cannot say that the Commission was unreasonable in making the comparison it did.[35]

### Immediate Implementation

Gardinier, Inc., a direct interruptible customer of FGT, also seeks review of Opinions 807 and 807–A, but with a different approach. While supporting the Commission's finding of an undue preference, it challenges the FERC's failure immediately to implement a substitute plan. It argues that § 5 mandates such immediate action and insists that both §§ 5 and 4 offer the procedures. We will address the § 5 and § 4 arguments separately.

■ Before going further, however, we must point out that a "reasonableness" standard governs our consideration of this issue. If the Commission has acted reasonably—in light of the basic fact findings and record evidence—in ordering the existing plan to remain in effect pending § 5 hearings,[36] we must sustain its decision. *American Smelting, noted supra,* 161 U.S.App. D.C. at 22, 494 F.2d at 941.

industrials begin to experience curtailments on an equal basis with direct industrials. And absent some evidence that the present plan actually *does* provide greater protection to high-priority users, discrimination based on that premise cannot be justified. *See North Carolina v. FERC, supra,* 190 U.S.App.D.C. at 31, 584 F.2d at 1012.

We also think that the thrust of the petitioners' argument aims at the unknown but impending future curtailment system rather than at the Commission's basic finding. In asserting their position, they have forgotten that the Commission must consider the impact that a plan actually does or will have on ultimate consumers. At this point the Commission has merely found that "economic factors have a diverse impact on [FGT's] customers, and [petitioners] offer no justification for disparate treatment of direct and indirect customers." It will next supervise implementation of a new

plan that allocates the gas in the most efficient way possible but without arbitrary distinctions within a class of customers. *See id.,* 190 U.S. App.D.C. at 31, 33–35, 584 F.2d at 1012, 1014–16.

**33.** R. at 1509–10. This figure assumes curtailment based on the estimated 1975 curtailment rates.

**34.** We use "similarly entitled" to mean those who enjoy similar use priority.

**35.** We also agree with the Commission that a more appropriate comparison in the curtailment context is between ultimate *consumers.* This is especially true in light of the Commission's duty to protect the public interest in the allocation of scarce supplies of natural gas.

**36.** *See* note 14, *supra.*

■ Section 5's mechanism for remedying discrimination in allocation of gas begins with the Commission's lawfully finding a § 4(b) violation. Upon such determination, the Commission will then impose its own plan, but only after a hearing and an administrative determination that the plan implemented is just and reasonable. *See Southern Natural Gas v. FPC,* 5 Cir., 1977, 547 F.2d 826, 832. While, as Gardinier asserts, the Commission would have emergency authority—even when conducting a § 5 hearing—to prescribe an interim plan,[37] it can do so only after a full hearing.[38]

■ This hearing requirement, along with the lack of record evidence on various curtailment plans, marks the source of the Commission's reluctance to impose an interim plan. Since the structure of the fact finding proceedings before the ALJ effectively precluded presentation of data regarding possible alternative curtailment plans, the Commission maintains that it must develop a record before it can reasonably enforce compliance with any new system, end-use or otherwise. Speedy action without the benefit of data on costs and effects, says the Commission, might result in the implementation of a plan more discriminatory than that now in existence.

The FERC agrees that it must remedy the discrimination (and denies petitioner's assertion that it is withholding relief). According to the Commission, the relief *is* forthcoming, but in accordance with the procedural requirements of § 5.

Gardinier asserts that the record does contain sufficient evidence to support temporary relief[39] and insists that § 5 absolutely requires such immediate action.[40] It points to decisions of several courts that have recognized the Commission's authority to issue interim curtailment orders.[41] We do not think, though, that these acknowledgments of authority necessarily mean that the Commission has an affirmative duty to fashion interim relief in all cases. Indeed, the opinions petitioner cites all recognize the Commission's discretion in determining whether such relief is necessary.[42]

The *Consolidated Edison* cases,[43] cited by Gardinier, do not support its position. They gering event and "thereafter" prescribes the time for remedy. Stating that "[n]owhere is there any support for construing the word to mean 'sometime in the indefinite future,'" petitioner asserts that "thereafter" necessarily implies *immediately.* Even assuming petitioner's interpretation of "thereafter" to be correct, we cannot buy this argument. According to the clear language of the statute, "thereafter" refers back to the Commission's implementation of a remedy. Thus the word itself imposes no burden upon the Commission to institute an interim plan.

37. *FPC v. Louisiana Power and Light Co., supra* 406 U.S. at 644, n. 18, 92 S.Ct. 1827, n. 18.

38. *American Smelting, supra* 161 U.S.App.D.C. at 14, 494 F.2d at 933. The Court's elaboration on this point is relevant here:

Like any order issued pursuant to section 5(a), an interim order can only issue after full hearing and must include a statement of reasons based on findings of fact which are supported by substantial evidence in the record. No emergency can excuse these procedural requirements.

39. *See Consolidated Edison Co. v. FPC,* 1974, 167 U.S.App.D.C. 134, 144, 511 F.2d 372, 382, in which the court found that in view of emergency conditions existing at the time, "the justifications offered by the Commission in support need not be as elaborate as required for the implementation of a permanent curtailment plan."

40. In petitioner's reply brief it argues that the word "thereafter" in § 5(a) refers back to the word "whenever." ["Whenever the Commission, after a hearing . . . shall find that any rate . . . is unjust, unreasonable . . . the Commission shall determine the just and reasonable rate . . . to be thereafter observed and in force, and shall fix the same by order * * *."] "Whenever" marks the trig-

41. *See FPC v. Louisiana Power & Light Co., supra.*

42. *See, e. g., American Smelting, supra,* in which the court stated that when the Commission is considering interim relief it must make two determinations:

(1) *whether* an interim curtailment order is necessary and (2) *whether* a particular interim plan is just and reasonable.
(Emphasis added).

43. *Consolidated Edison Co. v. FPC,* 1974, 167 U.S.App.D.C. 134, 511 F.2d 372 (*Consolidated Edison I*); *Consolidated Edison Co. v. FPC,* 1975, 168 U.S.App.D.C. 92, 512 F.2d 1332 (*Consolidated Edison II*).

instead reinforce our finding that the Commission *may* formulate an interim plan under § 5. In *Consolidated Edison I* the District of Columbia Circuit found that a 467-type curtailment plan—submitted by Transcontinental Pipeline (Transco)—would have an extremely harsh impact on certain customers. It therefore temporarily replaced the submission with a settlement agreement, previously rejected by the Commission, negotiated between Transco and its customers. After having discussed the reasons for its action, the court added that "[o]ur present action . . . in no way precludes the Commission from modifying the settlement or taking other action based on the information which it has generated . . . . * * * . . . . the Commission asserts, and we agree, that it has residual emergency powers to impose an interim plan where there is no alternative."

Warning that "[s]uch powers must be carefully confined," it nevertheless found that the Commission—faced with an emergency shortage of gas and little possibility of formulating a permanent curtailment plan before winter—could effect such a plan.[44] By acknowledging the Commission's authority to act, while at the same time providing for the possibility that it would not institute interim measures, the court clearly recognized the Commission's *discretion* to fashion such relief.

■ Similarly, in *Consolidated Edison II* the court reiterated its statement that "the FPC *might* issue interim curtailment orders *based on evidence compiled in hearings on a permanent plan*." (Emphasis added). It cautioned, however, that once the Commission instituted such relief, it "has a responsibility to monitor whatever interim plan may be in effect pending a final decision, and to make such adjustments as may appear warranted. * * * Our decision today places heavy reliance on the Commission's conscientious discharge of its over-

sight function." 168 U.S.App.D.C. at 103, 512 F.2d at 1343. Thus, contrary to Gardinier's assertion that the Commission's oversight function compels it to institute interim relief, that function arises *with* the implementation of interim measures.

■ Having found that the Commission indeed has discretion to impose an interim curtailment plan, we must now consider the question whether it has reasonably exercised this discretion. Gardinier, maintaining that the Commission has been unreasonable, attacks its stated reasons for not fashioning interim relief as "frivolous." The first of these reasons is the Commission's fear that a plan submitted in accordance with Opinion 807's order would be construed as a § 4 filing. Desiring to avoid the summary procedures involved with such filings,[45] the Commission ordered that FGT submit a "case in chief" rather than an actual curtailment plan.

Gardinier criticizes this action, accusing the Commission of suffering from a basic misunderstanding of § 5. A plan so ordered, according to petitioner, would be a § 5 *compliance* filing. We agree that only § 5 allows the Commission to impose a particular plan. *Southern Natural Gas Co. v. FPC*, 5 Cir., 1977, 547 F.2d 826, 832. We further acknowledge that if a pipeline files under coercion rather than voluntarily, the plan is invalid unless § 5 procedural requirements have been satisfied. *Consolidated Edison I, supra.*

But we fail to see how this renders the Commission's action unreasonable. Even under the 807 order, the Commission was not going to put FGT's proposal immediately into effect. It was going to conduct extensive hearings and supervise a detailed study in order to produce a just and reasonable final product. Assuming without de-

---

**44.** The court found that the procedural requirements of § 5 would be satisfied since a hearing on the relevant issues had been completed. ("We think that the record compiled provides an adequate basis on which the Commission, under the conditions which now confront Trans-

co's customers, could issue interim orders. . . .") 167 U.S.App.D.C. at 144, 511 F.2d at 382.

**45.** *See* discussion accompanying note 48, *infra.*

ciding[46] that the Commission misapprehended the effect of an ordered filing, we nevertheless find that that mistake would not necessarily have prejudiced petitioner. There is no indication that FGT's proposal would have taken effect before the plan that FGT and the Commission will ultimately produce.

The Commission also stated that it wished to avoid causing undue harm to schedule I customers of FGT-supplied distributors:

> To impose a 467–B plan on their system and its distributors with their heavy dependence on the industrial load without adequate consideration of its effects at a hearing would in our opinion be reckless. Likewise we cannot properly take the half-step of requiring equal treatment of the direct preferred interruptible customers and the I customers because the record is not sufficient on the entitlements of the various customers or the impact on any but a few. Therefore, we shall not prescribe an interim plan at this time but will allow the present plan to remain in effect pending further Commission order.

Gardinier attacks this reasoning with the observation that all end-use plans, however implemented, necessarily curtail low-priority users most heavily. It further contends that the Commission's refusal immediately to impose such a plan is inconsistent with its stated policy of ensuring priority of delivery to residential and commercial consumers during gas shortages.

If the Commission were truly concerned about possible economic harm to particular customers, continues Gardinier, it would have ordered expedited proceedings or have prescribed a plan with an invitation to seek special relief. Despite petitioner's concerns, we think that the Commission acted reasonably. The District of Columbia Circuit has recognized that a 467-type curtailment can have an unduly harsh impact on certain customers.[47] And the Commission *has* granted special relief to several parties claiming harm as a result of discrimination in allocation. By refusing to impose such a new plan without a sufficient record, the Commission is not shirking its § 5 remedial duties. It has merely determined that the (known) effects of the existing plan may be less severe than those of a plan prescribed without adequate study.

We now turn to Gardinier's claim that the Commission should have required the pipeline to shoulder its § 4[48] burden of

---

**46.** Such a finding would require a factual determination that the pipeline was not filing voluntarily.

**47.** *Consolidated Edison I, supra.*

**48.** Section 4(e), 15 U.S.C.A. § 717c(e):

(e) Whenever any such new schedule is filed the Commission shall have authority, either upon complaint of any State, municipality, State commission or gas distributing company, or upon its own initiative without complaint, at once, and if it so orders, without answer or formal pleading by the natural-gas company, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the natural-gas company affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed be-

fore or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of the suspension period, on motion of the natural-gas company making the filing, the proposed change of rate, charge, classification, or service shall go into effect. Where increased rates or charges are thus made effective, the Commission may, by order, require the natural-gas company to furnish a bond, to be approved by the Commission, to refund any amounts ordered by the Commission, to keep accurate accounts in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts were paid, and, upon completion of the hearing and decision, to order such natural-gas company to refund, with interest, the portion of such increased rates or charges by its decision found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon

unilaterally filing a proposed curtailment system. In our discussion of § 5 remedial procedures, we explained one of our objections to this position. If FGT were persuasively to claim that it had filed only under coercion from the Commission, and § 5 procedures had not been observed, the filings would be invalid.

If, on the other hand, FGT voluntarily filed, only *guided* by the 807 order, the § 4 mechanism would be set in motion. As we explained in *Southern Natural Gas Co., supra* at 832,

> [u]nder section 4, a regulatee can file its own plan, and, after 30 days, that plan will take effect unless the FPC suspends its operation. In no event can the FPC suspend a proffered plan for longer than five months.

Courts have recognized that § 4 allows "greater celerity and flexibility," *Southern Natural Gas Co., supra* at 832, and for that reason have often deemed it appropriate to proceed thereunder in emergency situations. *FPC v. Louisiana Power and Light Co., supra.* But as we have observed, the authority to do so is discretionary. The Commission stated specifically its reasons for not wanting any plan to become effective before the completion of a hearing and Commission action. Since we have found its rationale reasonably adequate in our discussion of § 5, we find it unnecessary to review it further. We thus reject Gardinier's claim.

### Transportation Gas

■ We finally turn to the contention of several of the petitioners[49] that the Commission should order curtailment of the FP and FPL-owned gas that FGT merely transports.[50] When considering this claim in the Fort Pierce proceeding, the Commission said

> [w]e do not concur with Cities in curtailing the T-gas under any of the contracts because such gas is not owned by Florida Gas and does not form a part of the system's gas supply from which gas can be allocated to its various customers.
>
> \*    \*    \*    \*    \*    \*
>
> Since legal title to the gas has vested in the two power companies prior to its interstate transportation, we do not believe that the *Louisiana Power and Light* and *Lo-Vaca Gathering Company* cases are applicable herein for purposes of Cities' request.

The Commission adopted this position in Opinion 807–A, in which it revoked joinder of FP and FPL and excluded transportation gas from the curtailment proceeding.

Petitioners advance several arguments in support of their attack on the Commission's order. The first is that § 1[51] of the Act grants the Commission the jurisdiction to curtail any gas that is transported in interstate commerce, regardless of who owns it. As authority for this statement, it cites two Supreme Court opinions, *FPC v. Louisiana Power & Light, supra*, and *California v. Lo-Vaca Gathering Co.*, 1965, 379 U.S. 366, 85 S.Ct. 486, 13 L.Ed.2d 357. We think both cases distinguishable.

In *Louisiana Power & Light* the Commission had imposed an interim curtailment plan to cover all sales customers of United Gas Pipe Line Company, both direct and resale. In rejecting the direct customers' objection that their sales were not jurisdictional and, therefore, could not be curtailed,

---

the natural-gas company, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible.

**49.** *See* note 2, *supra.*

**50.** *See* note 17, *supra.*

**51.** Section 1(b), 15 U.S.C.A. § 717(b):
 (b) The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas.

the Court said that "the Act applies to interstate 'transportation' regardless of whether the gas transported is ultimately sold retail or wholesale." 406 U.S. at 636, 92 S.Ct. at 1836.

Petitioners would have us find that just as it was unnecessary in *Louisiana Power & Light* to find direct sales jurisdictional for rate purposes, it is unnecessary to deal with the *ownership* of transportation gas. We cannot make the logical connection necessary to reach such a conclusion. The Supreme Court dealt only with the issue of whether the Commission could, independently of its sales jurisdiction, supervise curtailment of gas *owned* by a natural gas company.[52] It made this clear when it explained that

> [u]nder LP&L's argument, this volume would be wholly exempt from any curtailment plan approved by the FPC and thus United's resale customers would be forced to accept the entire burden of sharply reduced volumes while direct-sales customers received full contract service . . . .

*Id.* at 632, 92 S.Ct. at 1834. We cannot extend the Court's holding to allow Commission-ordered allocation of gas owned by two companies that are not subject to Commission jurisdiction.

Similarly, we do not agree with petitioners that *Lo-Vaca* provides a basis for including FGT's transportation gas within the Commission's jurisdiction. In that case El Paso Natural Gas Company purchased gas produced in Texas by Lo-Vaca and Houston Pipe Line Company. Pursuant to its various contracts with Lo-Vaca, El Paso bought gas both for resale (jurisdictional) and for its own use (non-jurisdictional). El Paso's contract with Houston restricted the gas to intrastate uses (non-jurisdictional). The Commission held that the commingling of the three supplies established FPC rate jurisdiction over the entire amount owned by El Paso.

The Supreme Court affirmed the holding, but we think that it made clear that the particular facts of the situation dictated the result.[53] Expressing fear that a contrary holding would allow pipelines to discriminate between producers by "immuniz[ing] [some] from the reach of federal regulation," 379 U.S. at 370, 85 S.Ct. at 488, the Court found that "the fact that a substantial part of the gas will be resold, in our view, invokes federal jurisdiction over the entire transaction." *Id.* at 369, 85 S.Ct. at 488. The Court has never extended this holding beyond the facts of this case—petitioners have not convinced us that we should.

Trying a slightly different tack, petitioners claim that the Commission has recognized its jurisdiction in at least two specific situations, in the *Sea Robin* proceedings[54] and in *Fort Pierce Utility Authority, supra.* We disagree. In *Fort Pierce* several of the petitioners before us today had applied for special relief from FGT's curtailment plan. They contended that transportation gas

---

**52.** The same reasoning would refute petitioners' assertion that "the *fact* of transportation in interstate commerce was the sole key to Commission jurisdiction in . . . *Ft. Pierce* [*Fort Pierce Utility Authority v. FPC*, 5 Cir., 1976, 526 F.2d 993]. In that case, as in *Louisiana Power & Light*, the Court upheld Commission jurisdiction over direct *sales* by FGT.

Petitioners also cite the *Assigned Car Cases*, 1927, 274 U.S. 564, 71 L.Ed. 1204, 47 S.Ct. 727. We, however, agree with the Commission that the Supreme Court's holding in that case does not support petitioners' position. This is made clear by the following excerpt:

> The rule does not divert the surplus of cars owned by one shipper to use by another. It merely puts a restriction upon the use of the private car by limiting the number of the

so-called assigned cars, which may be placed at a particular mine at a particular time. The owner may use the surplus elsewhere. Or he may lease the surplus cars to the carrier or to another shipper.

**53.** The Court admitted this when it said that "we cannot say that the adjudicatory process is not an appropriate method for drawing the line [between "jurisdictional" and "non-jurisdictional" sales] case-by-case . . . ." 379 U.S. at 371, 85 S.Ct. at 489.

**54.** Florida Gas Transmission Co., Docket Nos. CP65–393, *et al.* (Order Granting and Conditioning Certificate of Public Convenience and Necessity, issued May 2, 1977, and Order Denying Rehearing, issued July 27, 1977).

should be curtailed to help relieve the burden on FGT's sales customers. The Commission found that a special relief proceeding was an inappropriate forum for consideration of the question. It neither admitted nor denied jurisdiction. It simply ruled that the parties would have to reassert their claim pursuant to § 1.6 of the Commission's Rules of Practice and Procedure, 18 CFR § 1.6 (1975).[55]

In *Sea Robin* the Commission granted certification for the transportation of new deliveries of offshore gas by Sea Robin Pipeline to Amoco for sale to FGT. It conditioned the certificate upon the requirement that "the gas involved shall be delivered to FGT only in satisfaction of the Amoco-FGT . . . sale and none . . to [FPL]." The Commission acted upon the authority expressly granted to it in § 7(e)[56] of the Act to "lay down conditions precedent to the entry of natural gas into interstate commerce." It did not purport to assert curtailment authority over transportation gas. It did not force the pipeline to reallocate gas it did not own—Sea Robin would still deliver all the gas to Amoco, a natural gas company, over which the Commission has jurisdiction. The situation is clearly distinguishable from that presented here.

A recent case from the District of Columbia Circuit, *American Public Gas Association (APGA) v. FERC*, 1978, 190 U.S.App. D.C. 192, 587 F.2d 1089, lends support to the result we reach today.[57] In rejecting a claim that certain transportation gas had to be included in pipeline curtailment plans, the Court said that

. . . the purpose of a curtailment plan is to prescribe the manner in which a pipeline that cannot meet its contractual commitments will curtail deliveries of its *own* gas.

190 U.S.App.D.C. at 201, 587 F.2d at 1098.

The excerpt from *APGA* describes the situation before us. FGT stands in the

---

**55.** Section 1.6 in relevant part:

(a) Any person, including any state or local commission, complaining of anything done or admitted to be done by any licensee, public utility or natural gas company in contravention of an act, rule, regulation or order administered or issued by this commission, may file a complaint with the commission . . .. If, in the judgment of the commission a violation of an act, rule, regulation or order administered or issued by this commission, has been alleged and has not adequately been satisfied it will either invite the parties to an informal conference, set the matter for a formal hearing, or take any other action which in the judgment of the commission would be appropriate. In the event that a hearing is held the complainant automatically will be a party thereto and need not file a petition for leave to intervene.

**56.** Section 7(e), 15 USCA § 717f(e):

(e) Except in the cases governed by the provisos contained in subsection (c) of this section, a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operation, sale, service, construction, extension, or acquisition covered by the application, if it is found that the applicant is able and willing properly to do the acts and to perform the service proposed and to conform to the provisions of this chapter and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, sale, operation, construction, extension, or acquisition,

to the extent authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied. The Commission shall have the power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require.

**57.** Petitioners question the vitality of *American Public Gas Association*, contending that *California v. Southland Royalty Co.*, 1978, 436 U.S. 519, 98 S.Ct. 1955, 56 L.Ed.2d 505, undermines the District of Columbia Circuit's reasoning. They maintain that the Supreme Court's holding makes clear "that concepts of legal title and ownership are not the basis for determining the Commission's authority under the Natural Gas Act." Contrary to this assertion, the Southland Court spoke only with regard to the dedication of natural gas to interstate commerce. It held that once gas has been dedicated, it may not be diverted without abandonment authorization, regardless of whether the party that dedicated the gas has continuing title to it. It did not purport to expound the principle that property rights will in all cases be inferior to FERC authority.

The case before us does not involve abandonment. Nor does it involve gas over which the Commission once had jurisdiction. We find *Southland* inapplicable.

position of a bailee in relation to FP and FPL. We think that the Commission correctly determined that because FGT never owned the gas, it could not be compelled to allocate it to others. The transportation gas has never been a part of the supply available to FGT for satisfaction of its sales contracts. We see no authority for making it so now.

Having determined that the Commission correctly found that it had no jurisdiction over the transportation gas, we find it unnecessary to address fully petitioners' other arguments. We merely point out that the Commission's legal conclusion did not constitute a factual determination that the curtailment of transportation gas would not result in greater availability to some higher-priority users. Neither did it implicitly approve undue discrimination in allocation of supplies. Finding that the Commission acted reasonably, we affirm.[58]

ENFORCED.

---

**58.** To the petitioners' argument that the Commission's action regarding transportation gas has unlawful anticompetitive effect, we answer that we agree with the Commission on this point. Although the FERC has a responsibility to consider competitive impact in matters properly before it, *see, e. g., FPC v. Conway Corp.,* 1976, 426 U.S. 271, 96 S.Ct. 1999, 48 L.Ed.2d 626, alleged anticompetitive effect, in and of itself, does not create jurisdiction over natural gas.